David I. LONGMAN; Jeffrey Feinman; Paul M. Gardner, Defined Plan Trust; Edward Hankin; Linda Hankin, Plaintiffs–Appellants,

v.

FOOD LION, INCORPORATED; Tom E. Smith, Defendants–Appellees,

and

Lynne Neufer–Dale, Respondent,

Robert Harbrant; Jeffrey Fiedler; Keith Mestrich; Sean Cunniff; Food and Allied Service Trades Department, AFL–CIO; Research Associates of America; Neel Lattimore; Nicholas W. Clark; Maureen Dwyer; Allen Y. Zack; Charles L. Ulsch; Susan Barnett; Coopers & Lybrand, LLP, Movants.

No. 98–2116.

United States Court of Appeals, Fourth Circuit.

Argued: May 4, 1999

Decided: Oct. 7, 1999.

**ARGUED:** John Francis Bloss, Sr., Clark & Wharton, Greensboro, North Carolina, for Appellants. Richard L. Wyatt, Jr., Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, D.C.; William Kearns Davis, Bell, Davis & Pitt, P.A., Winston–Salem, North Carolina, for Appellees. **ON BRIEF:** David M. Clark, Clark & Wharton, Greensboro, North Carolina; Jeffery G. Smith, Shane Rowley, WOLF, Halderstein, Adler, Freeman & Hertz, L.L.P., New York, New York; Joseph H. Weiss, David C. Katz, Weiss & Yourman, New York, New York; Lubna Faruqi, FARUQI & FARUQI, New York, New York; B. Ervin Brown, II, Moore & Brown, Winston–Salem, North Carolina; Bernard Persky, Goodkind, Labaton, Rudoff & Sucharow, New York, New York, for Appellants. Charles L. Warren, Larry E. Tanenbaum, Thomas P. McLish, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, D.C.; James T. Williams, Reid L. Phillips, Brooks, Pierce, Mclendon, Humphrey & Leonard, L.L.P., Greensboro, North Carolina, for Appellees.

Before WIDENER, MURNAGHAN, and NIEMEYER, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WIDENER joined. Judge MURNAGHAN wrote a dissenting opinion.

## OPINION

NIEMEYER, Circuit Judge:

On the day after ABC aired its "Prime-Time Live" television broadcast on November 5, 1992, detailing allegedly widespread unsanitary practices and labor law violations in grocery stores owned by Food Lion, Inc., the price of Food Lion's Class A stock fell approximately 11%, and the price of its Class B stock fell approximately 14%. A week later, stockholders David Longman, Jeffrey Feinman, and others who had purchased Food Lion stock during the 2-½-year period before the broadcast filed these two class actions against Food Lion, which were later consolidated, alleging securities fraud under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The plaintiffs alleged that Food Lion affirmatively misled the market and failed to disclose that its earnings during the 2-½-year period were artificially inflated due to its misrepresentations about and failure to disclose widespread violations of federal labor laws and pervasive, unsanitary food handling practices. They alleged that these violations and practices were attributable to Food Lion's "Effective Scheduling System," which required employees to perform certain duties within specified times at the risk of losing their jobs.

The district court granted Food Lion's motion for summary judgment, concluding as a matter of law that Food Lion did not knowingly fail to disclose labor or sanitation problems and finding that plaintiffs could not "prove justifiable reliance" as to labor problems because they had already been disclosed and that the alleged sanitation problems were not material. For the reasons that follow, we affirm.

I

Food Lion is a publicly traded (over the counter) company with headquarters in Salisbury, North Carolina, that operates a chain of approximately 1,000 retail grocery stores in the southeastern part of the Unit-

ed States. During the relevant period, its earnings exceeded $200 million per year, and it employed about 60,000 persons.

As a management tool, Food Lion has employed a labor scheduling system, known as "Effective Scheduling," to assist department managers in scheduling their workforces based on the time that it should take an average employee to complete various tasks. While some stores have never met the goals set by the Effective Scheduling guidelines, others consistently have met those goals. In their complaints, plaintiffs alleged that the Effective Scheduling system established guidelines that were not attainable for many employees, thereby causing them to work "off the clock" without additional pay and to cut corners, including disregarding sanitary practices.

During the 2–½–year "Class Period" between May 7, 1990, when Food Lion issued its 1989 Annual report, and November 5, 1992, when the PrimeTime Live broadcast aired, plaintiffs purchased stock in Food Lion, allegedly relying on its rosy statements about its relationship with its employees and the cleanliness of its stores. Plaintiffs alleged that during this period, Food Lion "reported optimistically about its future" when, in fact, its profits and optimistic outlook were dependent on a system that required its employees to violate the labor laws and to pursue unsanitary methods, facts which Food Lion failed to report.

In its 1989 Annual Report, circulated on May 7, 1990, Food Lion stated that the Human Resources Department "continues to insure that Food Lion employees receive competitive wages and excellent benefits;" that although inflation led to higher costs, "[t]hese costs were recovered primarily through improved operating efficiencies and an increased average selling price per item;" and that "[w]e will continue to pay close attention to service levels and cleanliness in our stores and believe we will achieve high marks from customers in these areas." The report said nothing about any widespread labor or sanitary problems.

During the Class Period, Food Lion continued to face and to resist the efforts of the United Food and Commercial Workers Union ("UFCW") to organize Food Lion workers. When the union called for a boycott of Food Lion, the company issued a press release on August 30, 1990, stating:

How ironic it is on this Labor Day weekend for a union leader to call for the destruction of more than 45,000 jobs of Food Lion employees in retaliation for their desire to remain union free. Such blatant threats and arrogant disregard of true employee free choice is the kind of coercion of employees that totally desecrates the purpose and spirit of Labor Day.

The fact is, Food Lion opens more than 100 stores each year and adds more than 5,000 employees each year. Food Lion could not do this without offering competitive wages and excellent benefits. On average, Food Lion receives three to four applications for every available job.

About a year later, on September 11, 1991, the UFCW announced that it had filed a lengthy complaint with the Department of Labor, accusing Food Lion of widespread labor violations in tacitly encouraging employees to work "off the clock" without pay. In its press release, the union stated:

More than 37 percent of the after-tax profit of the nation's fastest-growing retail food chain, Food Lion, is derived from illegal off-the-clock work of employees.

\* \* \*

"Food Lion's profit is reported to exceed the industry average," the complaint [filed with the Department of Labor] states, "and its profit advantage is widely attributed to more efficient operations. With over one-third of its profit derived from illegal off-the-clock work, it

is clear that Food Lion's profit advantage is unfairly obtained."

\* \* \*

Food Lion could owe as much as $194 million in back wages. With liquidated damages allowed by law, its liability could be "as high as $388 million."

Food Lion responded with its own press release the same day:

Food Lion has a very clear policy against working off the clock. Employees, including managers, who have violated this policy have received discipline up to and including discharge.

This Complaint and news release by the UFCW union is simply one more example of the union's attempt to harass and coerce Food Lion management into recognizing the union without regard to the sentiments of our employees.

Food Lion employees have repeatedly rejected the UFCW union despite union efforts for more than ten years.

\* \* \*

As has been the case in all other attacks on Food Lion by this union, the company intends to defend itself vigorously in this matter.

On the following day, Food Lion issued another press release, stating:

The UFCW's most recent claims of illegal employment practices by Food Lion and its employees insult the hard work and integrity of all Food Lion employees. Those ingredients are the key to Food Lion's success and ability to bring customers extra low prices. It is not off the clock work by employees or other illegal employment practices as the UFCW-sponsored propaganda alleges.

\* \* \*

Food Lion denies union claims of employee mistreatment, but the public doesn't have to accept the word of either the Company or the union. Let employ-

ees and the free marketplace decide that.

\* \* \*

Nothing has been proven and nothing has been decided. Nevertheless, Food Lion is immediately commencing a detailed investigation of all the allegations in the Complaint and will take appropriate action.

Several months later, on February 27, 1992, Food Lion made further public statement with respect to the union's claims:

As before, the UFCW union is simply exploiting administrative charges and other litigation as part of its effort to unionize Food Lion. The fact is, Food Lion strictly forbids working off-the-clock or other wage/hour law violations. UFCW sponsored claims of extensive wage/hour violations are simply untrue. Food Lion management diligently works to prevent even isolated occurrences. When management discovers them, those responsible receive appropriate discipline, and the misconduct is stopped.

Food Lion's 1991 Annual Report, circulated on June 1, 1992, referred to "continued and constant harassment of Food Lion by the United Food and Commercial Workers Union," but it also stated more positively, "We believe that Food Lion's Extra Low Prices and its clean and conveniently located stores are especially well suited to the demands of our customers." The report quoted a store manager as saying, "Food Lion also provides job security, good wages, good working conditions and some of the best benefits in the supermarket industry." The report also included an unattributed statement that "Food Lion is one of the best-managed high growth operators in the food retailing industry." This Annual Report, like the 1989 Annual Report, did not acknowledge any widespread labor violations or sanitation problems.

Finally, in July 1992, Food Lion filed a form 10-Q with the Securities and Exchange Commission which stated:

Management and legal counsel for the Company are currently investigating and evaluating the allegations contained in the [UFCW] Complaints. The ultimate liability, if any, which may result is not presently determinable; however, in the opinion of management, the Company has meritorious defenses to the allegations and the Company intends to defend the allegations vigorously and any liability will not have a material adverse effect on the financial condition or results of operations of the Company.

On August 3, 1993, approximately one year after this public filing (and several months after the close of the Class Period), the Department of Labor announced a settlement of the UFCW-instigated complaints against Food Lion, in which Food Lion agreed to pay $16.2 million, $8.1 million in 1993 and $8.1 million in 1994. The $16.2 million represented $13.2 million in back wages for current and former Food Lion employees and $3 million in penalties. The cost of the settlement to shareholders was 1.67 cents per share for each year, 1993 and 1994 (i.e., $8.1 million divided by the 484,000,000 shares outstanding). Experts retained by both the plaintiffs and the defendants agreed that the settlement was not material to Food Lion's earnings. Indeed, the expert for Food Lion stated that the settlement's effect on income was *"de minimis."*

On November 5, 1992, after all of the publicity about Food Lion's ongoing labor disputes but nine months before the Department of Labor settlement, ABC broadcast a PrimeTime Live episode about Food Lion stores, alleging widespread unsanitary practices and off-the-clock work by Food Lion employees. PrimeTime Live attributed these deficiencies to Food Lion's Effective Scheduling system. The broadcast included interviews with former and current Food Lion employees and a hidden camera investigation conducted by two ABC employees who obtained jobs at three Food Lion stores. The employees who were interviewed alleged various unsanitary business practices, including pulling meat out of a dumpster and selling it, bleaching fish and pork with Clorox "[t]o get the smell out" and then selling them, mixing rotten pork with other pork and selling it as fresh sausage, and cutting off the edge of a block of cheese that had been nibbled by rats so that the rest of the block could be sold. An employee stated that she used "fingernail polish remover to take the dates off" of products so that they could be sold after the manufacturer's date for sale had passed. The hidden camera investigation showed unsanitary practices, such as an employee being instructed to alter the expiration date on ham so that it could be sold weeks after its expiration date.

Several employees described how they worked extra hours off the clock in order to be able to complete their assigned tasks. Diane Sawyer, who narrated the broadcast, summarized:

Over and over again, we were told that for workers, Food Lion is a kind of pressure cooker. The employees all said the company pays good salaries and has excellent benefits, including profit sharing. But there's a flip side, a time management policy called Effective scheduling, which critics charge forces a lot of workers to finish the work on their own time.

\* \* \*

Many employees told us that [the] pace [required by the Effective Scheduling system] is pounding. And since very little overtime is permitted, at the end of the day good workers were faced with an impossible choice: leave work unfinished, jeopardizing their jobs, or stay and finish, giving extra hours to the company without pay. It's called working off the clock, and it's illegal.

The day after the broadcast, Food Lion's Class A stock fell from $9.25 per

share to $8.25 per share, and its Class B stock fell from $10.00 per share to $8.625 per share. Within a week, the plaintiffs in these cases filed their class action suits— one on November 12, 1992, and the other on November 13, 1992—alleging that they purchased Food Lion stock based on artificially inflated earnings during the Class Period. They alleged that Food Lion's profits during that period before the broadcast had been attributable to these illegal practices and that Food Lion failed to disclose them to the market. The plaintiffs sued both Food Lion and its chairman of the board, president and chief executive officer, Tom E. Smith.

In its motion for summary judgment, Food Lion presented evidence that no corporate policy authorized or encouraged the unsanitary practices described in the PrimeTime Live broadcast. It stated that, on the contrary, it employs a team of auditors to ensure that its stores meet internal sanitation standards, as well as state and local regulatory standards. In addition, Food Lion pointed out that it is regularly subject to a variety of federal, state, and local inspections, including U.S. Department of Agriculture meat inspections, U.S. Food and Drug Administration surveys and evaluations, dairy inspections, and state and county food safety inspections. On the average, Food Lion stated that each store was inspected on an unscheduled, "surprise" basis between one and one and a half times per year by state or local health or agricultural inspectors. It claimed that it consistently received very high marks from state food sanitary authorities using numerical or alphabetical scales and always passed inspection in states that use a pass/fail inspection system. In one affidavit, Food Lion asserted that its sanitation and food handling compliance record was as good as, and in many cases better than, the records of its principal competitors. Food Lion also stated that it has a customer relations department that receives and investigates customer complaints about the quality of store conditions and products. Food Lion presented evidence that it served approximately 400 million customers per year but only received, on average, less than one complaint per store per year regarding the quality of sanitation.

Food Lion also challenged the plaintiffs' claim of labor law violations, presenting information that it was Food Lion's policy to require employees to report all time worked. Food Lion acknowledged that it has occasionally received reports that an employee worked off the clock, but in each case it investigated the report and corrected any violation. Food Lion contended that it also audits its stores for off-the-clock work, and internal audits showed that off-the-clock work occurred relatively infrequently and that when such work did occur, it was addressed appropriately and effectively. Food Lion acknowledged that before the Class Period, it had been charged with off-the-clock work involving a small number of claims and that it had settled those claims with the Department of Labor for $300,000. However, Food Lion maintained that at no time during the Class Period did Food Lion become aware of any evidence of widespread violations of its policy against off-the-clock work.

The district court granted Food Lion's motion for summary judgment, concluding first that the plaintiffs were "unable to demonstrate that any alleged omission concerning isolated instances of workplace errors [involving sanitation] is actionable as a matter of law because there is not a substantial likelihood that a reasonable investor would consider these isolated instances of workplace errors important in deciding whether to purchase Food Lion securities." In addition, as to the alleged labor violations, the court concluded that because the allegations had already been disclosed to the market, the plaintiffs were unable to prove "justifiable reliance on an alleged artificial stock price set by the market." Finally, the court concluded that the plaintiffs failed to offer evidence that defendants acted "with scienter by failing

to disclose the alleged omission concerning working off the clock or the alleged omission concerning poor sanitation in Food Lion stores."

For the same reasons, the court dismissed all related claims against Smith, as well as analogous claims alleged under state law.

This appeal followed.

## II

The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, was "designed to protect investors against manipulation of stock prices" through a philosophy of public disclosure. *Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). And it is well established that a private cause of action exists for violation of § 10b of the Act, 15 U.S.C. § 78j(b), and for violation of Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196–97, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

 To establish liability under § 10b of the Securities Exchange Act and under Rule 10b–5, a plaintiff must prove that, in connection with the purchase or sale of a security, "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied[1] (4) that proximately caused the plaintiff's damages." *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1261 (4th Cir.1993) (quoting *Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir.1991)); *see also Gasner v. Board of Supervisors,* 103 F.3d 351, 356 (4th Cir.1996).

 It is the first element that is at issue in this case—whether Food Lion made a false statement or omission of material fact. To establish this element, plaintiffs must point to a *factual* statement or omission—that is, one that is demonstrable as being true or false. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1091–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (observing that even opinion in the proper context can be demonstrably true or false and therefore factual); *see also* 7 Louis Loss & Joel Seligman, *Securities Regulation* 3423 (3d ed.1991). Also, the statement must be *false,* or the omission must render public statements *misleading. See* 17 C.F.R. § 240.10b–5. And finally, any statement or omission of fact must be *material.* Materiality is an objective concept, "involving

---

1. Where, as here, a plaintiff pursues a securities fraud action based on a fraud-on-the-market theory, he may, to demonstrate reliance, rely on a *presumption* of direct reliance created by his reliance on the integrity of the market.

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Basic,* 485 U.S. at 244, 108 S.Ct. 978 (quoting *In re LTV Sec. Litig.,* 88 F.R.D. 134, 143 (N.D.Tex.1980)). Accordingly, where material false statements or omissions have been disseminated to "an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 247, 108 S.Ct. 978; *see also Malone v. Microdyne Corp.,* 26 F.3d 471, 476 n. 5 (4th Cir.1994). But this fraud-on-the-market presumption is rebuttable. *See Basic,* 485 U.S. at 250, 108 S.Ct. 978; *see also id.* at 251, 108 S.Ct. 978 (White, J., concurring in part and dissenting in part) (agreeing with the majority that the presumption "must be capable of being rebutted by a showing that a plaintiff did not 'rely' on the market price").

In this case, the parties apparently agree that the market for Food Lion's stock is well-developed and efficient, and there is no suggestion that plaintiffs did not rely on the market price of Food Lion's stock.

the significance of an omitted or misrepresented fact to a reasonable investor." *Gasner,* 103 F.3d at 356 (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Thus, a fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact. *See Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (adopting standard from *TSC Industries,* 426 U.S. at 448–49, 96 S.Ct. 2126); *Gasner,* 103 F.3d at 356.

■ These components—a *factual* statement or omission that is *false* or *misleading* and that is *material*—interact to provide a core requirement for a securities fraud claim. While opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable. Thus, for example, a CEO's expression of "comfort" with a financial analyst's prediction of his company's future earnings was held not to be factual in that, as a future projection, it was not capable of being proved false. *See Malone v. Microdyne Corp.,* 26 F.3d 471, 479–80 (4th Cir.1994); *see also Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993) (holding similar statement predicting future growth not material because "the market price of a share is not inflated by vague statements predicting growth"). On the other hand, the Supreme Court has held that an opinion by board members to minority stockholders that the stock price of $42 for the purchase of their shares was a "high value" and represented a "fair" transaction could be both factual and material. *See Virginia Bankshares,* 501 U.S. at 1090–93, 111 S.Ct. 2749. In *Virginia Bankshares,* the Court noted that the opinions could be false and factual if the directors did not believe what they said they believed and proof could be had "through the orthodox evidentiary

process." *Id.* at 1093, 111 S.Ct. 2749. In addition, the court found "no serious question" that the statements could be material in that shareholders, knowing that directors have greater knowledge and expertise as well as a fiduciary duty to shareholders, often act on what their board members say they believe. *Id.* at 1090, 111 S.Ct. 2749.

With these relevant principles in hand, we turn to the misstatements and omissions that plaintiffs in this case allege "caused" them to purchase Food Lion stock during the Class Period.

### III

The essence of the plaintiffs' claim is that during the Class Period, Food Lion's earnings were "artificially inflated due to Food Lion's widespread violations of federal labor laws and pervasive unsanitary food-handling practices" and that Food Lion failed to disclose these facts and, indeed, publicly denied them. Plaintiffs contend that the true facts were "first disclosed to the public in credible fashion" when ABC News aired PrimeTime Live on November 5, 1992, presenting "an expose on Food Lion's labor and sanitation practices." Relying on the "integrity of the market" theory, the plaintiffs claimed that they purchased Food Lion stock "at artificially inflated prices and [therefore] were damaged." They alleged further that "[h]ad the plaintiffs and the other Class members known the truth, they would not have purchased Food Lion's common stock at the prices they did or at all."

Plaintiffs thus make two claims: (1) that Food Lion's labor practices illegally "forced employees to work overtime without pay," resulting in overstated profits, and (2) that Food Lion's "widespread unsanitary conditions and sale of spoiled meat inflated sales." We address each claim in turn.

### A

■ Throughout the Class Period, Food Lion expressed, in public statements,

substantial pride in the fact that its employees were well-paid and enjoyed good benefits. It claimed that it provided its employees with job security, good working conditions, and "some of the best benefits in the supermarket industry." Its Annual Reports for 1989 and 1991 and similar public statements expressed a belief that "Food Lion is one of the best-managed high growth operators in the food retailing industry."[2]

Plaintiffs claim that these rosy statements about employee compensation and benefits masked Food Lion's real labor problems that were created by its Effective Scheduling system and by the UFCW's complaint filed with the Department of Labor charging Food Lion with wage/hour violations. Plaintiffs' contention focuses on the allegation that Food Lion knew about employees being forced to work off the clock and that, even though the practice was widespread, it failed to disclose it. Because such work provided productivity from employees without compensation, the plaintiffs' theory goes, the practice illegally and artificially inflated Food Lion's earnings.

In addition, plaintiffs contend that, to the extent that the practices were made public by the UFCW and others, Food Lion's response was deceptive in explicitly denying or giving the implicit impression that it did not have significant amounts of off-the-clock work. For example, Food Lion said in response to the UFCW's complaint that it "intends to defend itself vigorously in this matter;" that the company's success was based upon the "hard work and integrity of all Food Lion employees," rather than on any "illegal employment practices;" and that "UFCW sponsored claims of extensive wage/hour violations are simply untrue." Likewise, in a filing with the SEC, Food Lion stated that while the "ultimate liability, if any, which may result [from the UFCW complaint] is not presently determinable ..., in the opinion of management, the Company has meritorious defenses to the allegations and the Company intends to defend the allegations vigorously and any liability will not have a material adverse effect on the financial condition or results of operations of the Company." Plaintiffs also point to the fact that, during this same period, Food Lion omitted to admit that its profits were substantially dependent on this off-the-clock work.

Plaintiffs' securities fraud claim cannot succeed because, despite the fact that Food Lion denied the charges, the nature of the off-the-clock claims and the claims' risk to earnings were in fact well known to the market before the PrimeTime Live broadcast, and therefore Food Lion's omissions were not material. *See Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 212–13 (4th Cir.1994) (noting that the securities laws do not require disclosure of information that is already in the public domain). On September 11, 1991, for instance, more than a year before the PrimeTime Live broadcast, the UFCW publicly announced that it had filed a complaint with the Department of Labor, asserting that 183 people had claimed to have illegally worked off the clock, that "[m]ore than 37 percent of the after tax profit" of Food Lion was attributable to off the clock work, and that "Food Lion could owe as much as $194 million in back wages." The union warned that Food

---

2. While not material to our holding, we note that we can find nothing in the record that would make these general statements by Food Lion, standing alone, actionable. First, these statements are immaterial puffery that is not actionable under the securities laws. *See, e.g., Raab,* 4 F.3d at 289–90; *Howard v. Haddad,* 962 F.2d 328, 331 (4th Cir.1992). Second, there is no evidence in the record that Food Lion employees were not well paid; that Food Lion did not have "some of the best benefits" in the industry; or that Food Lion was not well managed. Third, whether or not these statements are true, they do not bear on plaintiffs' claims that Food Lion forced its employees to work off the clock. Even if Food Lion's employees worked overtime without pay, they could still be well-paid compared to other employees in the industry.

Lion's liability could be as high as $388 million based on claims for liquidated damages. Even as Food Lion denied the claims, however, it nevertheless promised to conduct an investigation of the allegations and take appropriate action. The market had a full opportunity to evaluate these claims and to reflect their risk in the market price for Food Lion stock. *See Raab*, 4 F.3d at 289 (discussing "the presumption that the market price has internalized all publicly available information"). The PrimeTime Live broadcast added nothing to inform the market further. Rather, it simply repeated earlier charges through experiences of seven employees.

Because the market was thus informed of the union's charges before PrimeTime Live aired, what PrimeTime Live disclosed was not material. Indeed, even the much larger problem alleged more than a year earlier by the union was not material. Food Lion settled all of the claims made by the union with the Department of Labor for $16.2 million, $8.1 million payable in each of 1993 and 1994. During the same period, Food Lion's earnings exceeded $200 million per year. Experts on both sides agree that this settlement, reflecting a charge of less than two cents per share for each year, was not material to Food Lion's stock price. And consistent with this conclusion, Food Lion's share price did not drop following announcement of the Department of Labor settlement.

In short, the off-the-clock violations disclosed during PrimeTime Live were already publicly available and, therefore, were not material either to Food Lion's earnings or the price of its stock. *See Gasner*, 103 F.3d at 356.

## B

■ We turn now to the second category of alleged misstatements and omissions by Food Lion—those which related to unsanitary practices. The plaintiffs have juxtaposed Food Lion's ongoing public statements about the cleanliness of its stores with the PrimeTime Live broadcast which revealed allegedly widespread unsanitary practices. In its 1989 Annual Report, Food Lion stated: "We will continue to pay close attention to service levels and cleanliness in our stores and believe we will achieve high marks from customers in these areas." Similarly, in its 1991 Annual Report, Food Lion stated: "We believe that Food Lion's Extra Low Prices and its clean and conveniently located stores are especially well suited to the demands of our customers."

On their face, these statements are the kind of puffery and generalizations that reasonable investors could not have relied upon when deciding whether to buy stock. *See Gasner*, 103 F.3d at 356; *see also Raab*, 4 F.3d at 290 ("The market price of a share is not inflated by [such] vague statements"). Additionally, the plaintiffs have presented no evidence that Food Lion's stores were not generally clean or that customers complained about the lack of cleanliness in their stores. To the extent that the plaintiffs claim that these clean-stores representations masked the existence of unsanitary practices, they point to the broadcast from PrimeTime Live to support their claim.

■ Before considering the broadcast, the district court noted that, with a few exceptions, most of the broadcast was inadmissible hearsay. None of the people who spoke were under oath or subject to cross examination. In the absence of the evidence presented by the Prime-Time Live broadcast, or at least most of it, the district court was left with the affidavits of Food Lion which demonstrated that it had no corporate policy, written or unwritten, that would permit or encourage unsanitary food-handling practices. The court noted that Food Lion had "an audit staff in place who conducted surprise inspections of Food Lion stores to ensure that the stores complied with health and sanitation policies." And the court concluded that Food Lion's efforts were apparently sufficient to satisfy federal, state, and local inspections

which revealed that Food Lion's record was "just as good, if not better, than its competitors' inspection reports." .

But even considering the entire Prime-Time Live broadcast, the district court stated it "still does not present evidence of widespread unsanitary conditions of which Defendants knew." It noted that "with respect to the sanitary conditions at Food Lion's 1,000 stores, the [PrimeTime Live] broadcast is insufficient to draw any conclusions about Food Lion's operations as a whole." The court pointed out that the broadcast was filmed at only 3 of Food Lion's almost 1,000 stores and that out of 60,000 active employees and 40,000 former employees, PrimeTime Live interviewed a total of 70 current and former employees, 22 of whom had left the employ of Food Lion as much as 8 years before the Class Period. The district court concluded:

> [T]o the extent that there are any isolated instances of workplace errors, . . . not only is there not a substantial likelihood that the reasonable investor would consider the limited instances of workplace errors important in deciding whether to purchase Food Lion securities, but the Court also finds . . . that Defendants were taking steps to remedy these isolated problems. As a result, the Court finds that to the extent that there is any omission by Defendants in their Annual and Quarterly Reports of isolated instances of workplace errors, this omission not only is not material as required by § 10b but also could not make any affirmative statements misleading in Defendants' Annual and Quarterly Reports.

(Citations omitted).

We agree with the district court that, based on the record in this case, Food Lion was not required to make public statements about the existence of various sanitation problems that were revealed from time to time. These day-to-day conditions were not shown to be material to the price of Food Lion's stock. We also agree, as earlier noted, that the public

statements that it did make were no more than soft, puffing statements about clean and conveniently located stores that no reasonable investor could rely upon in buying or selling Food Lion stock. Accordingly, we conclude that Food Lion did not defraud the market with false statements or omissions of material fact as required to maintain an action under § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder. *See Hillson Partners*, 42 F.3d at 219 (noting that materiality depends on the "magnitude" of the event in light of total company activity).

IV

Plaintiffs also sued Tom E. Smith, the CEO of Food Lion, under § 20(a) of the Securities Exchange Act, which provides:

> ' Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Even if Tom Smith had sufficient "control" over Food Lion such that he could be held liable under § 20(a) for any of the alleged securities violation by Food Lion, we conclude that because there is no evidence of any such violation in this case, Tom Smith cannot be held liable, vicariously or otherwise.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion claims that Food Lion's failure to disclose its "off the clock" policy was not material because the market was fully in-

formed of any risks in the price of Food Lion's stock. The majority relies on the press reports reflecting the dispute between Food Lion and the UFCW over Food Lion's employment practices. In doing so, the majority cites *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204 (4th Cir.1994), and *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir.1993).

In *Hillson Partners* and *Raab*, the corporation-defendants made misleading statements to the market about their economic situations. In both cases, however, the defendants admitted their financial problems through additional public disclosures. *See Hillson Partners*, 42 F.3d at 212 (defendant disclosed the financial problems of its subsidiary in its Annual Report and a Form 10K filing); *Raab*, 4 F.3d at 289 (defendant issued a press release informing the market of an impending reduction in its earnings on the same day as the misleading statements in its Annual Report). Because the market had access to the defendants' financial problems, we held that the misleading statements were not material to the plaintiffs' decisions to purchase stock. *See Hillson Partners*, 42 F.3d at 212–13; *Raab*, 4 F.3d at 289.

*Hillson Partners* and *Raab* do not control the case at bar. The majority incorrectly suggests that *any* public information contradicting Food Lion's misleading statements forecloses the possibility of finding that those statements were material. However, the controlling principle is that "in a fraud on the market case, Food Lion's failure to disclose material information may be excused where that information has been made *credibly available* to the market by other sources." *Raab*, 4 F.3d at 289 (quoting *In re Apple Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989) (emphasis added)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 248–49, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The majority

does not analyze whether the allegations against Food Lion came from a *credible* source.[1]

Here, the market first heard about Food Lion's problems through an employment dispute between Food Lion and the UFCW. Food Lion had been resisting the efforts of the UFCW to organize Food Lion's workers. In August of 1990, the UFCW called for a boycott of Food° Lion's stores to. protest Food Lion's opposition to the union. Food Lion responded by accusing the UFCW of "the kind of coercion of employees that totally desecrates the purpose and spirit of Labor Day." The public thus was aware that Food Lion and the UFCW were involved in a bitter dispute over whether Food Lion's stores would unionize.

In September of 1991, the UFCW filed its complaint with the Department of Labor, citing Food Lion's policy of encouraging "off the clock" work by employees. Food Lion responded by denying the UFCW's claim. Food Lion also suggested that the claim was an effort to use unmeritorious litigation to force Food Lion to unionize. Food Lion stated in a public statement that "[a]s before, the UFCW union is simply exploiting administrative charges and other litigation as part of its effort to unionize Food Lion.... UFCW sponsored claims of extensive wage/hour violations are simply untrue." Food Lion thus characterized the UFCW's claim as merely another tactic in an ongoing labor dispute.

The information available to the public when the plaintiffs purchased Food Lion stock came from an admitted adversary of Food Lion. Given the history of antagonism between the parties and Food Lion's vehement denials, the information about Food Lion's policies did not come from a *credible source*. A dispute of fact, therefore, exists as to whether Food Lion's representations were material to the plain-

---

1. Obviously, we did not have to analyze whether the negative information in *Hillson Partners* and *Raab* came from a credible source. In both cases, the information came from the defendant's own statements.

tiffs' decisions to purchase Food Lion stock.

Because a dispute of fact exists as to whether Food Lion's representations were material, the district court's grant of summary judgment to Food Lion was inappropriate. I would reverse the district court's grant of summary judgment in favor of Food Lion.[2]

---

**2.** For the same reasons, I would reverse the district court's grant of summary judgment in favor of defendant Tom Smith.