**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 18-2194**

───────────────

XIA BI; NIAN CHEN; YUANYUAN CHEN; QINGLI CHENG; YING CHENG; DONGSHENG HU; JUN HUANG; KUI LE; CHUNGSHENG LI; ZHONGHUI LI; LIN LIN; LAN LIU; LING LIU; ZHENG QIN; MEIMING SHEN; YUNPING TAN; BIXIANG TANG; XIAONAN TANG; CHUN WANG; RUI WANG; YAHONG WANG; YUE WANG; JIAN WU; LEI YAN; JUNPING YAO; JIN YOU; ZHEN YU; HOUQIAN YU; NIANQING ZHANG; XUEMEI ZANG; HUIBIN ZHAO; YAN ZHAO,

     Plaintiffs – Appellants,

  v.

TERRY MCAULIFFE; ANTHONY RODHAM,

     Defendants – Appellees

  and

XIAOLIN CHARLES WANG; AMERICAN IMMIGRATION CENTERS, LLC, a Virginia limited liability company; CAPITAL WEALTH HOLDINGS LIMITED, a British Virgin Islands company; GREENTECH AUTOMOTIVE CAPITAL A-3 GP, LLC, a Delaware limited liability company; GREENTECH AUTOMOTIVE, INC., a Mississippi corporation; GULF COAST FUNDS MANAGEMENT, LLC, a Louisiana limited liability company; WM INDUSTRIES CORP, a Virginia corporation; DOES 1-100,

     Defendants.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:17-cv-01459-CMH-IDD)

───────────────

Argued: May 7, 2019                                    Decided: June 12, 2019

---

Before WILKINSON and NIEMEYER, Circuit Judges, and DUNCAN, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Senior Judge Duncan joined.

---

**ARGUED:** Gerard Patrick Fox, Marina Vladimir Bogorad, GERARD FOX LAW P.C., Los Angeles, California, for Appellants. Marc Erik Elias, PERKINS COIE LLP, Washington, D.C., for Appellees. **ON BRIEF:** Scott M. Abeles, GERARD FOX LAW P.C., Washington, D.C., for Appellants. Bruce V. Spiva, Amanda R. Callais, PERKINS COIE LLP, Washington, D.C., for Appellees.

---

WILKINSON, Circuit Judge:

Twenty-seven Chinese investors appeal from the dismissal of their claims against Terry McAuliffe and Anthony Rodham stemming from failed investments in an electric vehicle startup. For the reasons that follow, we affirm.

I.

A.

We accept as true the following facts, which come from plaintiffs' amended complaint. Plaintiffs-Appellants are a group of twenty-seven Chinese citizens who invested $500,000 each in a partnership that loaned their money to GreenTech Automotive. GreenTech, founded in 2008, was a Mississippi corporation that wanted to enter the hybrid and electric vehicle markets. Initially, GreenTech planned to produce the "MyCar," a vehicle that would travel at low speeds and thus be subject to lower levels of regulatory scrutiny.

This ambitious plan required a great deal of capital. GreenTech sought to raise some funds from foreign investors who might qualify under the Employment-Based Immigration Fifth Preference, or EB-5, Program. See 8 U.S.C. § 1153(b)(5). This program offered a path to permanent residency for foreign investors whose investments in American projects created or preserved at least ten jobs for American workers. While the program ordinarily required a $1 million investment, investments of $500,000 in certain rural areas or areas with high unemployment may also qualify under the EB-5 program.

3

GreenTech thus planned to build a new manufacturing facility in Tunica, Mississippi to take advantage of the lower investment threshold. The company collected funds from potential EB-5 immigrants through several different investment platforms. Some Chinese investors, for example, purchased preferred shares directly from GreenTech. The plaintiffs in this lawsuit, however, invested their money in GreenTech Automotive Partnership A-3, LP (the "A-3 partnership"), which was created to collect capital and then loan it to GreenTech. Plaintiffs' investments were governed by a series of documents, including "the private placement memorandum, the subscription agreement, the limited partnership agreement, a construction loan agreement, [and] a power of attorney agreement." J.A. 155. These documents were distributed to plaintiffs in English only, not Chinese.

Plaintiffs allege that they signed the subscription documents "without reviewing any version" and do not claim to have translated the documents into their native language. *Id.* at 181, 186. Pursuant to those written agreements, each of the twenty-seven plaintiffs paid $500,000 for a partnership share in A-3 sometime between July 2012 and December 2013. They each also remitted an "Administrative Fee" of $60,000 or $61,000 to Gulf Coast Funds Management, LLC, a GreenTech affiliate that managed the A-3 partnership.

In total, the A-3 partnership collected $500,000 from each of eighty-six investors, and then loaned the total of about $43 million to GreenTech. The loan terms were "not the result of arm's length negotiations." *Id.* at 169. The Private Placement Memorandum reveals that the loan, which was non-recourse, "specifically exclude[d] customary

4

provisions designed to protect the interests of lenders." *Id.* at 278. GreenTech would make interest-only payments to the A-3 partnership at a 4% interest rate; of that amount, 1.5% would be used to pay Gulf Coast yearly management fees. *Id.* at 257.

Defendants-appellees are Terry McAuliffe and Anthony Rodham.[1] McAuliffe was the co-founder and former Chairman of GreenTech. Rodham was the CEO of both the A-3 partnership and another entity that was formed to serve as A-3's general partner, GreenTech Automotive Capital A-3 GP, LLC. Rodham also served as President and CEO of Gulf Coast, the management company that received plaintiffs' administrative fees.

Plaintiffs claim that Rodham and McAuliffe made a series of false statements relating to the A-3 partnership's fundraising efforts. The complaint alleges that Rodham made the following misstatements:

(1) On April 25, 2011, Rodham claimed that EB-5 funds accounted for only 7.8% of GreenTech's capital during an event in Beijing, China.

(2) At this same event, Rodham expressed that Gulf Coast "chose" GreenTech as a suitable investment.

The complaint alleges that these statements were false because (1) far more than 7.8% of GreenTech's funds came from EB-5 investors; and (2) Gulf Coast could not *choose* GreenTech since they were under joint ownership and management.

The plaintiffs also allege that McAuliffe made four misstatements:

---

[1] We note that defendant Anthony Rodham passed away on June 7, 2019. Inasmuch as plaintiffs have failed to prevail against any appellee in this action, his passing has no bearing on the resolution of this appeal.

(1) On November 11, 2011, McAuliffe told a CNBC interviewer that GreenTech "ha[d] only sold 11,000 cars, but it's still a new business for us." J.A. 154.

(2) On January 14, 2012, McAuliffe informed Jan Paynter during an interview that GreenTech's first-year's production of electric vehicles would be sold to the country of Denmark.

(3) On July 23, 2012, McAuliffe said in an interview with three Chinese reporters that GreenTech was the first corporation to mass produce low-speed electric cars.

(4) On December 5, 2012, McAuliffe stated in an interview with a local NBC station that GreenTech "had a thousand employees." J.A. 155.

The complaint alleges that each of those statements was false when made because GreenTech (1) had not sold 11,000 cars; (2) did not have a contract with Denmark; (3) had not mass-produced any electric vehicles; and (4) had fewer than one hundred employees.

Plaintiffs allege that they each "relied on some or all of the statements in these newsletters, statements on GreenTech's websites and social media, and statements made by Mr. McAuliffe [and] Mr. Rodham . . . during roadshows, in interviews, and in written materials they authorized before signing the subscription agreement . . . ." J.A. 162. But there are no specific allegations that any individual plaintiff encountered any of those alleged misstatements in promotional materials or on Greentech's website. Twenty-two plaintiffs, moreover, allege that they moved to the United States on provisional visas in reliance on defendants' misrepresentations.

GreenTech, along with a web of related corporate entities, eventually failed to manufacture and sell vehicles according to its business plan. GreenTech defaulted on the

6

loan from the A-3 partnership, and the plaintiffs have not recovered their $500,000 investments. As of the filing of the amended complaint, GreenTech and several of the related entities had filed for bankruptcy. Plaintiffs now seek, *inter alia*, to recover the losses from their failed investments in the A-3 partnership.

B.

Plaintiffs filed their original complaint in Virginia state court. After removing the suits to the Eastern District of Virginia, McAuliffe and Rodham filed motions to dismiss. The district court granted the motions under Federal Rule of Civil Procedure 12(b)(6). With respect to the fraud claims so central to the complaint, it held that the plaintiffs had failed "to identify the facts needed to adequately plead claims . . . with particularity," J.A. 134, including allegations over "the manner in which [any false statements] misled the plaintiff[s], and the manner in which plaintiff[s] relied on the statements." *Id.* at 133-34. Plaintiffs were allowed twenty days to file an amended complaint.

The amended complaint honed plaintiffs' allegations by reducing the number of claims and dropping from the case several corporate defendants, which by that point had filed for bankruptcy and thus stayed any actions against them. The amended complaint raised claims against both McAuliffe and Rodham for fraud in the inducement (Count I); fraud (Count II); federal securities fraud (Count III); and conspiracy to commit fraud and breach fiduciary duties (Count VII). Plaintiffs also brought claims against Rodham for breach of fiduciary duty (Count IV); accounting (Count V); aiding and abetting a breach of fiduciary duty (Count VI); unjust enrichment (Count VIII); and negligence (Count IX).

7

McAuliffe and Rodham again moved to dismiss the claims against them for failure to state a claim under Rule 12(b)(6). And the district court again granted the motion, this time with prejudice. As to the fraud claims, the court noted that "[p]laintiffs do not state which of the named [p]laintiffs claims to have relied on each statement, or where or how any specific [p]laintiff heard or learned of the alleged statements." J.A. 478-79. For that reason, plaintiffs still had failed to plead reliance with the particularity required under the Rules of Civil Procedure. See Fed. R. Civ. P. 9(b). The court also noted that any reliance on the alleged misstatements was unreasonable because plaintiffs by their own admission did not read or review the offering documents.

The court also dismissed the claims for breach of fiduciary duty, unjust enrichment, and negligence because plaintiffs were not the appropriate party to bring these claims, which properly should have been brought by the partnership itself or as derivative claims. The subscription documents included a Delaware choice-of-law provision. See J.A. 351. Whether a claim is direct or derivative under Delaware law turns on whether the partnership suffered the alleged injury and whether it would receive the benefit of any recovery. *El Paso Pipeline GP Company, L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256-65 (Del. 2016).

As the district court put it, "[p]laintiffs still lack standing to assert such a claim . . . because any alleged injury that was suffered was suffered by the Limited Partnership and not by the [p]laintiffs directly" and because "[a]ny recovery to be had would be to the Limited Partnership and not to the individual [p]laintiffs." J.A. 481-82, 483-84. This was true, in part, because the subscription documents did not provide plaintiffs with a right to

8

withdraw their money from the partnership. See J.A. 334. The aiding and abetting a breach of fiduciary duty claim failed for the same reason. The district court dismissed the conspiracy claim along with the underlying breach of fiduciary duty and fraud claims. Finally, it dismissed the accounting claim because plaintiffs asserted no right to an accounting under the partnership agreement. Plaintiffs now appeal the district court's order dismissing their claims.[2]

## II.

Review of the district court's dismissal involves the special pleading standards applicable to claims of fraud. All complaints in federal court must, at a minimum, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Federal Rule of Civil Procedure 9(b) heightens pleading standards for claims of fraud, so that "a party must state with particularity the circumstances constituting fraud," except that "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiffs' federal securities fraud claim must also comply with the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737. The PSLRA leaves in place the general requirements of Rule 9(b), but requires pleadings to demonstrate, *inter alia*, "the

---

[2] The appeal chiefly concerns fraud claims based on alleged misstatements by Rodham and McAuliffe. We have reviewed the record and affirm the dismissal of plaintiffs' other claims for the reasons stated by the district court. With respect to plaintiffs' federal securities fraud claim, while we do not endorse the district court's statement that "the PSLRA[] prohibits the amendment of complaints," J.A. 480-81, the district court did in fact allow the complaint to be amended and any additional amendments would have been futile for the reasons set forth herein.

reason or reasons why [each alleged] statement is misleading" and to provide facts "giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b); see *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007).

A.

Plaintiffs bring both common law fraud claims under Virginia law and statutory fraud claims under federal law, here Rule 10b-5. See 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5 (Rule 10b-5). There are, no doubt, important legal differences between federal and state fraud claims. The state claims, for example, need not involve the "purchase or sale of a security" as required under Rule 10-5. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Rule 10b-5 claims, moreover, sometimes rely on legal theories that may not be available as a matter of Virginia common law. Compare *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (applying the fraud-on-the-market theory), with *Fentress Families Tr. v. Va. Elec. & Power Co.*, 81 Va. Cir. 67 (2010) (rejecting application of that theory).

This case, however, bottoms out on shared features of the state and federal fraud claims. Both federal and state law require that each defendant made a material misstatement. See *Stoneridge*, 552 U.S. at 157; *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014). To support recovery on any theory, moreover, plaintiffs must have justifiably relied on those same misstatements. See *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 227 (4th Cir. 2004) (federal securities law); *Jared & Donna Murayama 1997 Tr. v. NISC Holdings, LLC*, 727 S.E.2d 80, 86 (Va. 2012) (Virginia common law). It is to these common elements that we now turn.

10

B.

First, we consider whether the complaint alleges material misstatements. Defendants argue that some of their alleged statements cannot be material misstatements as a matter of law. They note that "an action based upon fraud must aver the misrepresentation of present pre-existing facts, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 490 (Va. 2010) (internal quotation marks omitted); see *Raab v. General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (forward-looking statements are often immaterial under federal securities law). Similarly, courts have long accepted that immaterial boasting and exaggerations, often called puffery, do not normally constitute actionable fraud. See *Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999) (federal securities law); *Tate v. Colony House Builders, Inc.*, 508 S.E.2d 597, 600 (Va. 1999) (Virginia common law).

The above rules serve important purposes. Forward-looking statements provide valuable information for investors in the securities marketplace, and they allow contracting parties to make better-informed judgments. But as Yogi Berra observed, "It's tough to make predictions, especially about the future." Even the most careful projections will sometimes prove wrong. Pinning liability on forward-looking statements would risk an influx of lawsuits concerning every major event, and would shut valuable projections entirely out of the market. See 15 U.S.C. § 78u-5(c) (federal safe harbor for forward-looking statements by certain issuers and their affiliates).

11

Puffery, too, serves an important role in the formation of contracts large and small. There is little doubt that expressions of enthusiasm and use of superlatives are common tools for skilled salespersons. See J.A. 155 (McAuliffe describing GreenTech as a "great American success story"). These sorts of statements can help inspire confidence and trust when those qualities are in short supply, and ultimately serve to encourage the free flow of capital in the marketplace. There is, in the end, little reason to purge the market of all optimism. Projections and puffery will thus rarely qualify as material misstatements under federal and state law. See *Longman*, 197 F.3d at 685; *Tate*, 508 S.E.2d at 600.

The problem for defendants, however, is that their alleged misstatements go beyond mere projections or puffery. Rodham, for example, said that EB-5 funds accounted for only 7.8% of GreenTech's capital. This statement was not an expression of optimism or speculation as to who might invest in the future; it was an assertion about what funds had been raised in the past. McAuliffe's alleged misstatements were even more aggressive. GreenTech either had "sold 11,000 cars," or it had not; it had "a thousand employees," or not; and it had mass-produced electric cars, or not. Those statements were plainly not forward-looking. See *Malone v. Microdyne Corp.*, 26 F.3d 471, 472-80 (4th Cir. 1994) (discussing forward-looking statements).

Even McAuliffe's alleged statement that the first year of vehicle production would be sold to the country of Denmark, which at first blush describes a future event, fails closer inspection. Read in the light most favorable to the plaintiffs, this is no simple statement of opinion or future intent; it claims that a named buyer had agreed to purchase

12

specific vehicles at a particular time. Plaintiffs' allegation thus counts as an assertion of fact under the case law in this circuit. See *Raab*, 4 F.3d at 289-90.

In toto, defendants' statements ran in front of the facts on the ground. There are no laurels in this case, no accolades to be bestowed. These are just the sort of misstatements targeted by statutory and common law fraud causes of action. False information is not useful to the market, and may lead investors to commit their resources in ways that will prove harmful. See *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 496 (1995) (Stevens, J., concurring in judgment). Far from building investor confidence, misstatements like those alleged in this case undermine public trust. We decline to whitewash the alleged misstatements here.

## C.

Defendants also argue that plaintiffs have failed to adequately plead justifiable reliance on the alleged misstatements. We agree with the district court that plaintiffs' complaint falls far short of plausibly pleading justifiable reliance.

### 1.

Under Virginia common law, plaintiffs must allege "reasonable or justifiable reliance" on a defendant's misrepresentations. *Murayama 1997 Tr.*, 727 S.E.2d at 86 (internal quotation marks omitted). "[T]he touchstone of reasonableness" under Virginia law "is prudent investigation." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999). Federal law similarly requires that an investor "justifiably relied" on particular misstatements in an action under Rule 10b-5. *Miller*, 364 F.3d at 227 (internal quotation marks omitted). As with Virginia common law, federal securities law "requires

13

plaintiffs to invest carefully" and conduct at least "minimal diligence." *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1028 (4th Cir. 1997) (internal quotation marks and alterations omitted). Plaintiffs cannot recover, in other words, if they "possess[] information sufficient to call a misrepresentation into question but nevertheless close [their] eyes to a known risk." *Id.* (internal quotations marks and alterations omitted).

Plaintiffs invite the court to assess the element of justifiable reliance without turning to Rule 9(b)'s heightened pleading standards. See Fed. R. Civ. P. 9(b). But our circuit has previously held that "[r]easonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud . . . and such reliance must be pleaded with particularity." *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987) (citing Rule 9(b)). Indeed, Rule 9(b) itself provides that "a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). How and whether a party relied on a misstatement is every bit as much a "circumstance[] constituting fraud" as any other element. *Id.* And when Congress or the Federal Rules intend for an element of fraud to be pleaded under a different standard, they tell us so explicitly. Rule 9(b), for example, specifically instructs that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Plaintiffs can point to no similar language placing the element of reliance beyond the reach of Rule 9(b). With equal clarity, the PSLRA requires pleadings to include facts "giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b), while leaving Rule 9(b)'s background pleading standards in place for the other elements of

14

fraud. See *Hunter*, 477 F.3d at 172. There is, in sum, no textual basis to give plaintiffs extra wiggle room in pleading the reliance elements of their state and federal fraud claims.

The plaintiffs' argument also fails as a matter of common sense. Rule 9(b) seeks "to provide defendants with fair notice of claims against them and the factual ground upon which they are based . . . ." *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013). This rationale applies with special force to allegations of reliance, which inherently rest on information within a plaintiff's possession. See *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 852-53 (6th Cir. 2006). Whereas defendants are likely to know facts that will allow them to contest the falsity of their own statements or their own state of mind, they have little reason to know how a plaintiff learned of any misstatements or what role they played in a plaintiff's investment decisions. Particular allegations of reliance thus lie at the core of Rule 9(b)'s mandate.

2.

Plaintiffs' complaint fails to adequately plead justifiable reliance, instead relying only on general and conclusory allegations. Paragraph 103 of the amended complaint provides a prime example:

> Each of the Plaintiffs relied on some or all of the statements in these newsletters, statements on GreenTech's websites and social media, and statements made by Mr. McAuliffe [and] Mr. Rodham . . . during roadshows, in interviews, and in written materials they authorized before signing the subscription agreement and transferring their $500,000 investment and $60,000 or $61,000 Administrative Fee.

15

As the district court noted, "[p]laintiffs do not state which of the named [p]laintiffs claims to have relied on each statement, or where or how any specific [p]laintiff heard or learned of the alleged statements." J.A. 478-79. The only information provided that is specific to any given plaintiff is the individual's name, citizenship, current residence, and the dates of his subscription agreement and money transfer. A list of names and investment dates may be important, but it does nothing to show how any plaintiff learned of a given misstatement, or whether any plaintiff even relied on a given misstatement at all. The district court was correct to dismiss the complaint because these general allegations do not satisfy us that the plaintiffs have "substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

The facts of this case make those omissions particularly glaring. Most of the alleged misstatements, for example, were made in English—a language that many of the plaintiffs allege they do not understand. What is more, many of those alleged misstatements were made to American media, sometimes of the local variety. It is far from clear how or whether plaintiffs learned of these statements. This is not to say that statements to media sources, even local ones in distant lands, cannot form the basis of a meritorious fraud claim. Far from it. We live in a day and age where news travels fast and vast amounts of information are easily accessible online. But the realities of the Internet do not alter the fundamental need for plaintiffs to plead reliance with particularity, and the amended complaint falls short of that bedrock requirement.

16

Even if plaintiffs had properly described who relied on each misstatement and how that person heard of it, they fail to plead justifiable reliance. Investments often boil down to a series of written contracts. In this case, those contracts included "the private placement memorandum, the subscription agreement, the limited partnership agreement, a construction loan agreement, [and] a power of attorney agreement." J.A. 155. The written offering documents must control, and here they in fact contradicted the sorts of stray media statements attributed to Rodham and McAuliffe.

The Private Placement Memorandum, for example, made clear that GreenTech was "a development stage company," J.A. 243, that was raising money to "design, build, and *commence* production" of vehicles at a new production facility, J.A. 274 (emphasis added). It also warned that the underlying loans from the partnership to GreenTech did "not contain market terms and specifically exclude[d] customary provisions designed to protect the interests of lenders." *Id.* at 278. It said, in all capital letters, that "AN INVESTMENT IN THE PARTNERSHIP IS SPECULATIVE AND INVOLVES A SIGNIFICANT DEGREE OF RISK." J.A. 237. It also described how GreenTech had already raised capital from investors under the EB-5 program, *id.* at 275, and that "[n]o assurance can be given that an investor will receive a conditional or permanent lawful resident status in the U.S. or that an investment in the Partnership will comply with the EB-5 [p]rogram," J.A. 259 (internal emphasis omitted). In short, the plaintiffs plainly "possesse[d] information sufficient to call [the alleged] misrepresentation[s] into question." *Banca Cremi*, 132 F.3d at 1028 (internal quotations marks and alterations omitted).

17

But plaintiffs make clear in their complaint that they signed the subscription documents "without reviewing any version." J.A. 181, 186. Indeed, they allege that they only recently discovered "the nature of the documents they signed." *Id.* at 155. There is no allegation in the complaint that they made any effort to translate the documents into their native language, or even asked any English-speaking attorney or investment advisor to review the documents for them.

The question is whether plaintiffs could justifiably rely on the alleged misstatements when they did not read, translate, or ask advisors to review the subscription documents. Several factors may influence whether reliance was justifiable as a matter of law. See *Banca Cremi*, 132 F.3d at 1028; *Sweely Holdings, LLC v. Suntrust Bank*, 820 S.E.2d 596 (Va. 2018) (finding reliance unjustifiable as a matter of law). But this case is not close. The investments in a start-up company on the edge of new automotive technology obviously signaled a high degree of risk. Risk invites prudence; prudence involves inquiry. The plaintiffs here were putting more than half a million dollars in the hands of foreigners with whom they alleged no prior relationship. It was unjustifiable to make such an investment in reliance on stray media statements without so much as translating or even reviewing the subscription documents before signing them. While everyone occasionally skips over the fine print in their day-to-day endeavors, it is fair to expect some minimal level of due diligence before making this large an investment in a company whose prospects were chancy and where sizeable returns were anything but guaranteed.

Even so, plaintiffs ask this court to excuse any unjustifiable reliance on the basis that defendants "divert[ed them] 'from making the inquiries and examination which a prudent man ought to make.'" *Hitachi*, 166 F.3d at 629 (quoting *Horner v. Ahern*, 153 S.E.2d 216, 219 (Va. 1967)). This argument also fails. Plaintiffs were clearly provided the relevant offering documents. Nothing in plaintiffs' amended complaint so much as suggests that defendants prevented them from taking the modest step of reviewing the operative offering documents that they signed. The defendants had no generalized duty to translate the subscription documents for the benefit of foreign investors, especially when translation would open a new avenue of dispute and the English version of those documents would have been controlling in any event. J.A. 353. Imposing some invariable new duty of translation on parties seeking to raise funds from foreign investors would hike the costs of international financing for many nations, encourage new mistranslation lawsuits, and open the door to additional forms of mischief. There is no plausible allegation in the complaint that defendants diverted plaintiffs from conducting a prudent and objectively reasonable investigation before investing. See *Hitachi*, 166 F.3d at 629.

Our emphasis on reliance should come as little surprise: that element occupied the lion's share of the briefing in this court and was part of both the first and second orders to dismiss from the district court. See J.A. 133-34, 478-79. Yet when the panel asked plaintiffs' lead counsel where the complaint adequately alleged reliance, he repeatedly stated that his co-counsel would answer those questions on rebuttal. But the court was not obligated to hold its questions on reliance for rebuttal, at which point the opposing party would no longer have a fair opportunity to respond. Just as counsel may divide oral

19

argument time, the court may expect lead advocates to be familiar with more than a tiny corner of the complaint and parties to advance arguments when opposing counsel has the chance to take issue with them. Our ultimate inquiry, of course, rests on the adequacy of the complaint itself—but basic fairness must not become a casualty of the appellate process at any stage.

## III.

America has always relied on entrepreneurship and investment to propel her economy forward. The EB-5 program was intended to recognize that immigrants can play an integral role in that story, providing jobs for our society in exchange for the opportunity to be a part of it. But the truth of the matter is that investments are inherently risky, with the hope of reward weighed always against the fear of failure. Not every failed investment can lead to a meritorious fraud lawsuit. The element of justifiable reliance encourages a modicum of personal responsibility for investment decisions and helps to distinguish those who were wrongly misled from those making *post hoc* attempts to recoup market losses. Because the amended complaint failed to adequately allege justifiable reliance, the district court's decision to dismiss it is

*AFFIRMED*.