PRESENT: All the Justices

JARED AND DONNA MURAYAMA 1997 TRUST

                                        OPINION BY
v.  Record No. 111377          JUSTICE ELIZABETH A. McCLANAHAN
                                        JUNE 7, 2012
NISC HOLDINGS, LLC, ET AL.

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                     Jonathan C. Thacher, Judge

     Appellant, the Jared and Donna Murayama 1997 Trust (the

"Trust"), through its Trustee, Jared Murayama ("Murayama"),

challenges the circuit court's order sustaining a demurrer to

the Trust's second amended complaint.  In that complaint, the

Trust sought damages arising from a settlement agreement between

the Trust, Murayama and two of the defendants, NISC Holdings,

LLC ("NISC") and Omen LLC ("Omen"), which transaction included

NISC's repurchase of the Trust's voting stock in NISC (the

"settlement agreement").  The Trust claimed it was damaged from

selling the stock to NISC for substantially less than its fair

market value as a result of the Trust's reliance on fraudulent

omissions and misrepresentations of the defendants: (i) NISC;

(ii) Omen, a company NISC previously acquired from the Trust;

(iii) DC Capital Partners, LLC and DC Capital Partners

Investments, LLC (collectively "DC Capital Partners"), NISC's

largest shareholder; and (iv) Thomas Campbell ("Campbell"), the

chairman of NISC and the managing member of DC Capital Partners (the appellees in this appeal).[1]

The circuit court sustained the defendants' demurrer upon determining that the Trust's allegations, as amplified by the settlement agreement, established that, as a matter of law, the Trust did not reasonably rely upon the defendants' alleged fraudulent omissions and misrepresentations regarding the value of the NISC stock at the time of the settlement. The circuit court reached that conclusion based upon both the language of the settlement agreement and the allegations regarding the adversarial relationship between Murayama and the defendants that precipitated the settlement. Agreeing with the circuit court, we will affirm its judgment sustaining the demurrer.

## I. BACKGROUND

Because the circuit court decided this case upon a demurrer, we will summarize the facts as alleged in the Trust's second amended complaint. Kaltman v. All Am. Pest Control, Inc., 281 Va. 483, 486, 706 S.E.2d 864, 866 (2011). We will also include in the summary relevant provisions of the settlement agreement, as the defendants properly submitted the agreement for the circuit court's consideration through its

---

[1] The Trust also named International Business Machines Corporation ("IBM") as a defendant but non-suited its claims against IBM after dismissal of the second amended complaint.

motion craving oyer.[2]  Ward's Equip. v. New Holland N. Am., Inc.,
254 Va. 379, 382, 493 S.E.2d 516, 518 (1997).  "In doing so, we
consider the facts stated and all those reasonably and fairly
implied in the light most favorable to the nonmoving part[y],
[the Trust]."  Kaltman, 281 Va. at 486, 706 S.E.2d at 866
(citing Yuzefovsky v. St. John's Wood Apartments, 261 Va. 97,
102, 540 S.E.2d 134, 137 (2001)).

At all times relevant to this action, Murayama was the
manager of the Trust. In 2007, the Trust was the majority owner
of Omen, a Maryland based information and technology management
company that Murayama founded and managed for several years.  In
June 2007, DC Capital Partners, a Virginia limited liability
company, formed NISC, a Delaware limited liability company
located in Virginia, for the purpose of acquiring and
consolidating information management and technology companies
serving various federal government agencies.  On June 29, 2007,
NISC purchased Omen from the Trust.  As consideration for the
sale, the Trust received 48.78 percent of the Class A voting
stock in NISC, a cash sum of $1,425,000 payable in November
2008, Class B non-voting shares in NISC, and a seat on NISC's
board of managers.  The Trust appointed Murayama to that

_____

[2] What is referred to herein as the "settlement agreement"
actually consisted of two documents, one entitled the
"Settlement Agreement" and the other entitled the "Murayama
Financial Claims Settlement Agreement," both of which were
executed together on December 9, 2009.

position, which he held for the next two and a half years – until December 9, 2009, when the settlement agreement was executed.  In addition, by that same date, as a result of NISC's subsequent acquisitions of additional companies, the Trust's Class A membership interest in NISC was diluted to 5.41 percent.  Also following NISC's purchase of Omen, NISC hired Murayama as an advisor to Campbell, NISC's chairman.

In a significant development leading to the instant dispute, Murayama became involved with "a native Hawaiian organization known as Hawaii 5-0," which was "owned by . . . a charitable, not-for-profit foundation."  According to the Trust, in January 2009, Murayama discussed with Campbell Murayama's "prospective role" at Hawaii 5-0, and "became a part-time uncompensated advisor to Hawaii 5-0" after receiving Campbell's "express consent."  Significantly, the Trust alleges that "Hawaii 5-0 did not compete with NISC and Mr. Murayama did not violate any non-competition agreements with NISC."  Further, "[a]t no time prior to November 2009 did [d]efendants ever express to Mr. Murayama any concern about his involvement with Hawaii 5-0."

NISC and Omen, however, advanced a completely different view of Murayama's activities involving Hawaii 5-0 in relation to NISC and Omen.  On November 9, 2009, NISC and Omen filed a lawsuit in Fairfax County Circuit Court against Hawaii 5-0 and

4

several former NISC and Omen employees who became employed by Hawaii 5-0.[3]  While Murayama was not named as a defendant in the action, the complaint stated in detail how he allegedly conspired with the named defendants "to steal business from NISC/Omen, raid NISC/Omen's employees, and take corporate opportunities belonging to NISC/Omen for their own benefit." Pled in twenty-one counts, the sixty-page complaint alleged conspiracy, breach of contract, tortious interference, conversion, and violations of the Virginia Computer Crimes Act and Uniform Trade Secrets Act, among others, and sought a preliminary injunction and millions of dollars in compensatory, treble, and punitive damages.

Referring to Murayama no less than sixty-four times, the complaint alleged that he owed non-competition, non-solicitation, fiduciary and confidential obligations to NISC and Omen, and breached them by his unlawful activities with the named defendants.  As an example, the complaint alleged that Murayama and his former co-shareholder of Omen, Robert Bregante, violated their agreements with NISC and Omen – entered into when they sold Omen to NISC – not to compete with NISC or Omen and not to solicit NISC or Omen's customers or employees.  Murayama and Bregante allegedly engaged in "a systematic campaign to

---

[3] A copy of the NISC/Omen complaint is attached as Exhibit 1 to the Trust's second amended complaint.

recreate the Omen business under the Hawaii 5-0 umbrella, thus effectively stealing back what they had just sold to NISC/Omen." NISC and Omen then alleged, in regard to their trade secrets claim, that Bregante and defendant Andrew Ganias, former chief financial officer of Omen and present chief financial officer of Hawaii 5-0, "conspired with Murayama, who remains not only an employee but a member of NISC/Omen's Board of Managers, to misappropriate NISC/Omen's trade secrets and other proprietary information.  For example, Murayama emailed . . . Bregante and Ganias NISC/Omen's highly confidential financial statements which . . . Bregante and Ganias then used to advance Hawaii 5-0's business interests."

As a further example of Murayama's alleged wrongdoing, the NISC/Omen complaint stated that Murayama sent emails to his "co-conspirators" in March 2009 in which he told them that he had to " 'stay below radar for technically [sic] am still an employee of Omen,' " and that they needed a different " 'front man' " because he had to " 'stay low for now.' "  He also allegedly assured one of his co-conspirators, however, that when Hawaii 5-0 would eventually need a local president, " 'by that time yours truly should be available.' "

NICS and Omen also stated in their complaint that Murayama engaged in the alleged unlawful activities in his capacity as a

6

member of NICS's board of managers and a business adviser to them both, for which they paid him an annual salary of $275,000.

Within three days of filing their complaint, NISC and Omen delivered it to Murayama's counsel, along with a demand in the form of a proposed settlement agreement. Counsel for NISC and Omen made it "clear" that the proposed agreement was being offered as an alternative to adding Murayama and the Trust to the lawsuit. The proposal was thus presented to Murayama "as a prepackaged deal that would include him [and] the Trust, as well as the named defendants." Trust's Second Am. Compl. ¶ 24 (emphasis in original). Central to the terms of the proposal was the requirement that the Trust return its Class A membership stock to NISC "even without compensation if NISC's lender did not approve the payment to buy back the shares. According to the proposed settlement agreement, the [Trust's] Class A [m]embership [i]nterest was worth approximately $1,000,000 dollars." Id. (emphasis in original).

Following the parties' negotiations through their respective counsel over the terms of the ultimate settlement, the Trust, Murayama, NISC and Omen (along with certain named defendants in the NISC/Omen lawsuit) executed the settlement agreement on December 9, 2009. The settlement agreement expressly recited that NISC and Omen believed that Murayama was involved in the conduct at issue in the NISC/Omen lawsuit, and

7

that they contemplated amending their complaint to add Murayama and the Trust as defendants. Having settled their disputes pursuant to the terms of the settlement agreement, however, NISC and Omen therein released all claims they had against the Trust and Murayama and certain named defendants in the NISC/Omen lawsuit "arising at any time before the execution" of the settlement agreement, without any of the released parties paying any money.

NISC and Omen did so in exchange for the Trust's agreement to sell its NISC Class A membership interest to NISC for $2,000,000. Murayama was also obligated to resign from NISC's board of managers.

As to the value of the NISC Class A membership interest transferred under the settlement agreement, Murayama and the Trust therein "acknowledge and agree that they are fully aware that NISC is considering and pursuing a range of strategic alternatives, including a sale of the company or a qualified public offering, that could ultimately result in a different valuation" of the Class A shares than the $2,000,000 being paid pursuant to the terms of the agreement. Murayama and the Trust also "acknowledge and agree that they have had sufficient opportunity to confer with their financial advisors concerning the [a]greement."

8

The settlement agreement also provided standard mutual disclaimers and releases. In particular, Murayama and the Trust "irrevocably and unconditionally release[d]" and "forever discharge[d]" NISC and Omen from all claims "known or unknown, arising at any time before the execution of this [a]greement, whether based on: . . . fraud . . . or any other theory of recovery . . . and all claims which Murayama . . . or [the] Trust may now have or may have had, arising from in any way whatsoever connected with their prior employment, membership on [b]oards of [m]anagers, or ownership of a Class A [m]embership [i]nterest in NISC . . . ." The settlement agreement further provided that each party to the agreement "acknowledges that it or he has relied upon its or his own judgment and the advice of counsel and financial advisors in making this [a]greement."

The Trust alleges that up to the time of the execution of the settlement agreement on December 9, 2009, Murayama and the Trust, in fact, did not know and the defendants in the instant action did not disclose to them any information regarding the defendants' specific pursuits to sell NISC. In fact, according to the Trust's allegations, the defendants "knowingly and intentionally withheld [that] information" from the Trust and Murayama, even though they were entitled to it based on Murayama's position as a member of NISC's board of managers. The Trust alleges that, because Murayama held that position up

9

until the time the settlement agreement was executed, "the Trust reasonably assumed it would have known of such activity and reasonably relied on [d]efendants that such events did not exist. In fact, NISC and Omen['s] attorney, Mr. Keiser, represented in telephone conversations with the Trust's counsel that a sale of NISC was not in the works or imminent."

Furthermore, the Trust alleges that the defendants owed the Trust fiduciary duties, which would include duties to "disclose the value of the [NISC] Class A shares, the impending sale of [NISC], that other offers were made to acquire [NISC], [and] NISC's dealings with IBM."

Murayama and the Trust only learned after execution of the settlement agreement, however, that IBM entered into a confidentiality agreement with NISC in August 2009 "to perform due diligence ahead of acquiring NISC." Then in November 2009, in the process of obtaining assistance in the sale of NISC from several financial advisors, the defendants represented that NISC's value exceeded $367,000,000. The financial advisor ultimately retained by the defendants valued NISC at more than $400,000,000. Accordingly, prior to December 9, 2009, the defendants offered to sell NISC to at least three different companies for an amount in excess of $400,000,000. In addition, prior to that date, IBM made an offer to purchase NISC for an amount in excess of $300,000,000. And in a meeting of NISC's

10

board of managers in November 2009, to which Murayama was not invited, those present were informed that NISC had received purchase offers in excess of $300,000,000, and that "the sale of NISC was imminent."

NISC and IBM then announced publicly on January 20, 2010, that IBM had acquired NISC. The purchase price was $367,000,000. After learning of this sale, along with the information summarized in the preceding paragraph, the Trust instituted the instant action, claiming Murayama "had been duped by [d]efendants into giving up the Trust's [NISC] shares for $2,000,000, a price far below market value." The Trust alleged that the sale of NISC to IBM would have resulted in a distribution of approximately $9,000,000 to the Trust. On that basis, the Trust sought judgment against the defendants in the amount of $7,000,000 in compensatory damages, $350,000 in punitive damages, and attorney's fees. As set forth in the Trust's second amended complaint, the Trust sought these damages upon claims of fraud in the inducement (Count I), negligent misrepresentation (Count II), breach of fiduciary duty and duty of good faith and fair dealing (Count III), abuse of process (Count IV), and unjust enrichment (Count V).

Having prevailed on their demurrer to essentially the same allegations in the Trust's first amended complaint, the defendants demurred to the Trust's second amended complaint.

11

Significantly, however, we note that in allegations set forth in the first amended complaint, which were omitted in the second amended complaint, the Trust admitted that, despite Murayama's membership on the NISC board of managers, "Mr. Murayama was <u>prevented</u> from having access to the books, records and activities of NISC and its affiliates.  Mr. Campbell repeatedly <u>ignored and/or refused Mr. Murayama's requests</u> for such information."  (Emphasis added.)

By order dated February 14, 2011, the circuit court sustained the second demurrer for the same reason it sustained the first demurrer.  As explained in its letter opinion accompanying the order, the court concluded that the Trust's allegations demonstrated as a matter of law that it did not reasonably rely upon the defendants' alleged fraudulent misrepresentations and omissions related to the value of the Trust's NICS Class A membership stock transferred under the terms of the settlement agreement.

The circuit court reasoned that consideration of the facts alleged "inescapably leads to the conclusion that [the] Trust was not justified in its reliance and had every reason to question the [d]efendants['] silence and statements regarding any sale of NISC and the value of [the] Trust's shares."  The court specifically noted that "the parties' relationship had clearly developed into an adversarial one at the time of the

settlement negotiations"; that the settlement agreement contained "an explicit no reliance clause"; and that the agreement disclosed that "NISC was considering a range of options, including a stock sale, that could ultimately lead to a different valuation of [the] Trust's shares."  These facts would have "arouse[d] the suspicions of an ordinary person," the court determined.  Yet, the Trust "saw fit to trust itself in the hands of the [d]efendants instead of demanding information and investigating as a reasonable person would have."  The court thus sustained the demurrer to the second amended complaint, and did so with prejudice.

We granted the Trust an appeal from the judgment sustaining the demurrer to the second amended complaint on the following assignments of error:

1. The trial court erred in sustaining the [d]emurrer to the [s]econd [a]mended [c]omplaint when there was a material contested issue of fact relating to the "reasonableness" of the Trust's reliance on the fraudulent conduct of the NISC [d]efendants, which concealed their pending sale of the [c]ompany for $367 million.

2. The trial court erred in sustaining the [d]emurrer to the [s]econd [a]mended [c]omplaint when the NISC defendants had a duty to inform the Trust (and Jared Murayama) about its negotiations to sell [NISC], the pending sale to IBM, and professional valuations of [NISC] made prior to sale.

3. The trial court erred in sustaining the [d]emurrer to the [s]econd [a]mended [c]omplaint, and thus dismissing the allegations in toto, before the Trust had any opportunity to take discovery on its allegations of fraud.

13

## II. ANALYSIS

In our review of the circuit court's decision sustaining a demurrer, we are guided by well-established principles.  The purpose of a demurrer is to determine whether a complaint states a cause of action upon which the requested relief may be granted.  Code § 8.01-273; Dunn, McCormack & MacPherson v. Connolly, 281 Va. 553, 557, 708 S.E.2d 867, 869 (2011).  A demurrer tests the legal sufficiency of the facts properly alleged in the challenged pleading and the inferences fairly drawn from those facts, all of which are accepted as true.  Id. A demurrer does not admit, however, the correctness of the pleader's legal conclusions.  Dodge v. Randolph-Macon Woman's College, 276 Va. 1, 5, 661 S.E.2d 801, 803 (2008).  Because the circuit court's ruling on a demurrer presents an issue of law, we review the decision de novo.  Dunn, McCormack & MacPherson, 281 Va. at 557, 708 S.E.2d at 869.

Upon allegations in its pleadings of fraudulent procurement of the settlement agreement by the defendants, the Trust has sought to have set aside those terms of the agreement (i) that established the price paid to the Trust for its NISC stock, and (ii) that released the defendants from all such fraud claims by the Trust and Murayama, so as to allow the Trust to pursue an award of an additional $7,000,000 for the stock as compensatory damages, along with $350,000 in punitive damages.

14

As we explained in <u>Metrocall of Delaware, Inc. v.</u>
<u>Continental Cellular Corp.</u>, 246 Va. 365, 373-74, 437 S.E.2d 189,
193 (1993) (internal citations omitted) (emphasis added):

> [A] written, mutual release memorializing a compromise
> and settlement may be rescinded for fraud in its
> procurement.  And, the wrong of fraud requires an
> intentional, knowing misrepresentation by a defendant
> of a material fact upon which a plaintiff has relied
> to its detriment.  Concealment of a fact that is
> material to the transaction, knowing that the other
> party is acting on the assumption that no such fact
> exists, is as much fraud as if existence of the fact
> were expressly denied.  <u>But to establish fraud, it is</u>
> <u>essential that the defrauded party demonstrates the</u>
> <u>right to reasonably rely upon the misrepresentation.</u>
> [S]ome courts label this requirement "justifiable
> <u>reliance</u>."

In its second amended complaint, the Trust has plainly
alleged facts demonstrating, when taken as true, that the
defendants made material misrepresentations to the Trust and
Murayama regarding the value of the Trust's NISC stock.
Specifically, the defendants misrepresented to the Trust and
Murayama in the proposed settlement agreement that the stock was
worth approximately $1,000,000 when, in fact, it was worth
nearly ten times that amount based on values being placed on
NISC by the company, as well as others, at that time.  The
defendants likewise misrepresented to the Trust and Murayama the
value of the Trust's NISC stock when the defendants indicated in
the settlement agreement that the stock was worth $2,000,000 -

the amount the plaintiffs actually paid the Trust for the stock under the terms of the agreement following negotiations.

As Metrocall makes clear, however, to withstand the defendants' demurrer and establish a cause of action based on fraud, the Trust also had to demonstrate in its pleadings that the Trust and Murayama, acting on behalf of the Trust as its trustee, reasonably relied upon the misrepresentations and omissions by the defendants that allegedly constituted the fraud. Absent such reasonable or " 'justifiable reliance,' " no fraud is established. Id. at 374, 437 S.E.2d at 194.

In Metrocall, on facts analogous to those here presented, this Court affirmed the trial court's dismissal of the plaintiffs' action for rescission of a prior settlement of litigation between the same parties or their privies based on allegations of defendants' fraud in the inducement of the settlement. Id. at 376-77, 437 S.E.2d at 195. The plaintiffs in Metrocall, as parties holding a minority interest in Norfolk Cellular Telephone Company ("NCTC"), initiated the original litigation against the majority entity (the managing general partner of NCTC), claiming it was guilty of a number of improper and fraudulent acts. The parties subsequently reached a settlement of their dispute, which included an extensive general release. As part of the settlement, the plaintiffs also agreed to transfer their NCTC interests to the defendant majority

16

entity and its affiliates for an agreed sum.  After the plaintiffs' sale of their NCTC interests was consummated, the majority group sold those interests to a third party for a price significantly greater than that paid to the plaintiffs.  Id. at 367, 437 S.E.2d at 190.

Much like the claims of the Trust in the instant case, the plaintiffs in Metrocall subsequently filed consolidated actions claiming that, during the negotiations to settle the prior litigation, "the defendants were simultaneously and covertly conducting negotiations to sell the entire partnership to the third party for the higher price."  Id.  Indeed, the plaintiffs alleged that during the settlement negotiations, the defendants falsely represented that they would not sell the plaintiffs' NCTC interests to any third party.  Id. at 368, 437 S.E.2d at 190.  The plaintiffs further alleged that they detrimentally relied upon the defendants' misrepresentations and omissions of material information in regard to those negotiations, and would not have entered into the prior settlement agreement had they been aware of those negotiations.  Id. at 367-70, 437 S.E.2d at 189-191.  The plaintiffs also alleged that the defendants' subject actions constituted a breach of their fiduciary duties owned to the plaintiffs during the negotiations, "even though defendants were plaintiffs' adversaries in litigation."  Id. at 369-73, 437 S.E.2d at 191-93.

17

We held that the plaintiffs had no right, as a matter of law, "reasonably to rely upon any misrepresentations or concealment of facts by the defendants in connection with the settlement and execution of the [settlement agreement]; there was no justifiable reliance." Id. at 374, 437 S.E.2d at 194. A compelling consideration for the Court was the fact that the plaintiffs had negotiated the subject settlement to litigation in which they were alleging that the defendants were guilty of a number of improper and fraudulent acts. Id. at 375, 437 S.E.2d at 194. The Court reasoned that, "when negotiating or attempting to compromise an existing controversy over fraud, dishonesty, and self-dealing, it is unreasonable to rely on the representations of the allegedly dishonest party." Id. at 375, 437 S.E.2d at 195. In other words, the Court explained, there is "no logical basis" for parties who are "represented by counsel and involved in an adversarial relationship" to expect "full disclosure to the adverse parties, prior to settlement." Id. at 375, 437 S.E.2d at 194.

As the United States Court of Appeals for the Ninth Circuit Court recently stated in rejecting an attempt to set aside a settlement including a sale of stock:

> Parties involved in litigation know that they are locked in combat with an adversary and thus have every reason to be skeptical of each other's claims and representations. They can use discovery to ferret out a great deal of information before even commencing

18

settlement negotiations.  They can further protect themselves by requiring that the adverse party supply the needed information, or provide specific representations and warranties as a condition of signing the settlement agreement. Such parties stand on a very different footing from those who enter into an investment relationship in the open market, where it's reasonable to presume candor and fair dealing, and access to inside information is often limited. There are also very important policies that favor giving effect to agreements that put an end to the expensive and disruptive process of litigation.

Facebook, Inc. v. Pacific Nw. Software, Inc., 640 F.3d 1034, 1039 (9th Cir. 2011) (internal citations omitted).

Though the Trust and Murayama did not sue NISC or the other defendants in this case for fraud in the litigation that was the subject of the settlement agreement challenged here, Metrocall's application of the underlying principle of reasonable reliance in fraud claims provides guidance for our application of that principle to the facts here presented.  In its broader context, Metrocall dictates that parties to a settlement agreement that were in an adversarial relationship and represented by counsel at the time of negotiation and settlement, as in the instant case, will be strictly held to this reasonable reliance standard under Virginia law when seeking to vitiate the settlement based on claims of detrimental reliance on the misrepresentations and/or omissions of information by the adversary.

The Trust argues that the circuit court erred in deciding the reasonable reliance issue adverse to the Trust as a matter

19

of law rather than allowing the issue to be decided by a jury as a disputed issue of fact. On the facts alleged, the Trust asserts, "it is entirely credible that the Trust was not 'alerted' to the potential fraud and thus reasonably relied on the statements and actions of the NISC [d]efendants." We disagree. As the circuit court correctly determined, careful consideration of the facts alleged, viewed in their totality, compels the conclusion that the Trust was not justified in its reliance on any misrepresentations and omissions by defendants regarding the value of the Trusts' shares in the company.

Once the defendants filed the NISC/Omen complaint, alleging numerous, significant unlawful acts committed by Murayama, as a "co-conspirator," against NISC and Omen in a multi-million dollar lawsuit, and threatened to name both Murayama and the Trust as defendants in the lawsuit if the Trust did not agree to transfer its NISC Class A stock to NISC, the defendants clearly became the adversaries of both Murayama and the Trust. At that point, the Trust and Murayama had every reason to be skeptical of the defendants' actions and representations in regard to such demand. This was particularly so when the defendants' allegations against Murayama in that lawsuit are viewed as false, as they must be upon our review, given that the Trust alleges that neither Murayama nor Hawaii 5-0 was guilty of the conduct charged in the NISC/Omen complaint. From that

20

perspective, Murayama and the Trust reasonably should have viewed the defendants' actions as most egregious, and "alert[ing]" them to question the defendants' actions, representations and motives.

In their initial demand, the defendants represented that the Trust's NISC Class A stock was worth approximately $1,000,000, but even then the defendants were demanding that it be transferred to them without any compensation to the extent NISC's lender would not approve the payment to buy the stock. Over the course of negotiations through the parties' respective counsel, the defendants then changed their purported valuation of the stock and represented in the settlement agreement that it was worth $2,000,0000 - constituting a one-hundred percent increase from the defendants' representation as to the stock's value just four weeks earlier.

In addition, as to the defendants' pursuit of a sale of NISC, the Trust received conflicting representations from the defendants. During negotiations over the settlement agreement, the defendants' counsel communicated to the Trust's counsel that "a sale of NISC was not in the works or imminent." However, in the settlement agreement, the defendants represented just the opposite, expressly stating that "NISC was considering a range of options, including a stock sale, that could ultimately lead to a different valuation of [the] Trust's shares." The Trust

21

also acknowledged in its allegations that Murayama, in his capacity as a member of NISC's board of managers, had requested, but was "repeatedly" denied, access to the books, records and activities of NISC.

We hold, as did the circuit court, that these facts established as a matter of law that the Trust did not reasonably rely on any misrepresentations and omissions by defendants in regard to the value of the Trust's NISC stock for purposes of determining its sale price under the terms of the settlement agreement.

The Trust, therefore, will be held to the terms of the settlement agreement, in which it expressly released the defendants from any known or unknown claims based on fraud or any other theory of recovery "arising from or in any way whatsoever connected with [its] ownership of a Class A [m]embership [i]nterest in NISC."

Finally, the Trust contends that the circuit court erred as a matter of law in dismissing the second amended complaint without permitting any discovery or investigation. Rule 4:1(d§ 2) states: "Discovery shall continue after a demurrer . . . addressing one or more claims or counter-claims has been filed and while such motion is pending decision – <u>unless the court in its discretion orders that discovery on some or all issues in the action should be suspended</u>."  (Emphasis added.)

22

See also, <u>Titan America, LLC v. Riverton Inv. Corp.</u>, 264 Va. 292, 306-08, 569 S.E.2d 57, 65 (2002).

Pending its ruling on the demurrers to the Trust's first and second amended complaints, the circuit court suspended discovery by orders dated August 27, 2010 and January 7, 2011, and by a ruling from the bench at the end of the parties' hearing on the demurrer to the second amended complaint on January 28, 2011. The Trust agreed to the first order, objected to the second order, and stated no objection to the third ruling by the court to continue the suspension of discovery.

Assuming arguendo that this assignment of error was not waived, we cannot conclude that the circuit court abused its discretion in suspending discovery - pending its ruling on the demurrer to the second amended complaint - where the allegations in that complaint, taken as true, established that the Trust did not reasonably rely upon the defendants in determining the value of the stock it sold to NISC.

## III. CONCLUSION

For the reasons stated, we will affirm the judgment of the circuit court.

<u>Affirmed</u>.