PRESENT: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Russell, S.J.

SWEELY HOLDINGS, LLC

v. Record No. 171165

OPINION BY
JUSTICE D. ARTHUR KELSEY
NOVEMBER 21, 2018

SUNTRUST BANK, ET AL.

FROM THE CIRCUIT COURT OF MADISON COUNTY
Daniel R. Bouton, Judge

SunTrust Bank ("SunTrust") made secured loans totaling $18.3 million to Sweely Holdings, LLC ("Sweely") and later sought to recover collateral when Sweely defaulted and threatened bankruptcy. The parties negotiated a Master Loan Modification and Forbearance Agreement ("Workout Agreement") that provided Sweely with another opportunity to pay its debt. When Sweely failed to do so, SunTrust took action against Sweely's collateral.

In response, Sweely filed this suit against SunTrust, alleging, among other things, breach of contract, fraud in the inducement, and constructive fraud. The circuit court dismissed the case on demurrer, finding that the Workout Agreement defeated Sweely's breach of contract claim and that Sweely had failed to state a claim for any fraud. We agree and affirm.

I.

A.

"Because this appeal arises from the grant of a demurrer, we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the plaintiff." *Coward v. Wellmont Health Sys.*, 295 Va. 351, 358 (2018). Though we "accept as true unstated inferences to the extent that they are *reasonable*, we give them no weight to the extent that they are *unreasonable*. The difference between the two turns on whether 'the inferences are strained, forced, or contrary to reason,' and thus properly disregarded

as 'arbitrary inferences.'" *Id.* at 358-59 (emphases in original) (citations omitted). We also "distinguish allegations of historical fact from conclusions of law. We assume the former to be true *arguendo*, but we assume nothing about the correctness of the latter because 'we do not accept the veracity of conclusions of law camouflaged as factual allegations or inferences.'" *Id.* at 359 (emphasis in original) (citation omitted).

B.

1. The Failed Loan Transaction

The Amended Complaint[1] alleges that, in 2008, Sweely and SunTrust engaged in an $18.3 million commercial-lending relationship to provide capital for the Sweely Holdings Estate Winery in Madison County, Virginia ("the Winery"). In addition to personal property at the Winery estimated to have a value of $2.5 million, Sweely offered four parcels of real property as collateral for the loans: (i) a horse farm in Florida appraised at $10 million; (ii) a mixed-use farm property in Madison County with a tax-assessed value of $1.5 million; (iii) the Winery in Madison County appraised at $16 million; and (iv) the Sweely family farm in Madison County appraised at $6.2 million.

Sweely defaulted on these loans in May 2010. Pursuant to the loan documents, SunTrust seized $1.8 million of Sweely's cash assets from Sweely's Interest Reserve Account. After Sweely had declared its intention to seek bankruptcy protection, the parties entered into "discussions and negotiations regarding a workout of the loans." J.A. at 7. Sweely alleges that during one of those discussions in 2010, a SunTrust employee falsely stated that SunTrust had obtained appraisals of the four parcels that showed a collective fair market value of $10.5 to

---

[1] The circuit court sustained a demurrer to Sweely's initial complaint and dismissed that complaint with leave to amend. Sweely filed a First Amended Complaint, hereinafter "Amended Complaint," which the court dismissed with prejudice in response to SunTrust's demurrer.

$13.5 million. Sweely asked for copies of these appraisals but did not receive them during the negotiations.

At the time of this alleged misrepresentation, Sweely claims, SunTrust possessed appraisals estimating the collective worth of the parcels to be $22.8 million and had filed regulatory documents repeating this valuation. According to Sweely, SunTrust intended the misrepresentation as a subterfuge to deter Sweely from declaring bankruptcy because SunTrust would be able to seek relief from the automatic stay of collections imposed by bankruptcy law if the low appraisals were accurate and if SunTrust were an under-secured lender.

The Amended Complaint concedes that "Sweely initially expressed doubt as to the accuracy of the appraisals"[2] but nevertheless alleges that Sweely "believed and relied on the misrepresentation that SunTrust possessed appraisals showing" a value of $10.5 to $13.5 million for the collateral and "further believed and relied on the misrepresentation that SunTrust could demonstrate to a court that there was a negative equity position on the loans." *Id.* at 9. The possibility that SunTrust could make that under-secured showing, Sweely alleges, caused it "not

_____

[2] SunTrust's demurrer to the Amended Complaint relied upon various documents that were the subject of a motion craving oyer. Four of them were appraisals, one for each of the properties that served as collateral, which Sweely consented to being made part of the record. *See* J.A. at 59. Another document was a memo written by Jess Sweely stating that, at the meeting in which SunTrust claimed it had low appraisals, Jess Sweely "told [the SunTrust employee] that the appraisals were a farce and that what she was proposing made no sense" and "that there was no way that all of the appraisals were only $13.5 million." Ex. 3 to Original Demurrer (filed Sept. 8, 2015); *see also* J.A. at 42-43, 46-47 (relying on the same exhibit in the demurrer to the Amended Complaint).

Sweely conceded in the circuit court that the memo "memorialize[d]" what Jess Sweely had said to the SunTrust employee. J.A. at 60. Sweely, however, objected to the memo being considered pursuant to SunTrust's motion craving oyer. While hearing arguments in open court, the court stated that it intended to "defer ruling on the motion craving oyer" because such a ruling was not "critical at this point." Hr'g Tr. at 69 (Jan. 4, 2017). The court's final order, however, stated that it had considered SunTrust's demurrer, which relied upon the memo. *See* J.A. at 71; *see also id.* at 42-43, 46-47. For purposes of our analysis, however, we will assume without deciding that the court did not base its decision to sustain the demurrer on the memo.

3

to file for bankruptcy, not to negotiate for more favorable workout terms . . . , and to enter into the Workout Agreement instead." *Id.*

Pursuant to SunTrust's motion craving oyer, the circuit court admitted into the record four appraisals that SunTrust had obtained in 2010 and 2011. *See supra* note 2. The 2010 appraisals of the Winery, the family farm, and the Florida horse farm offered two alternative valuations: a "Market Value As Is," which assumed, for each separate property, a one- to four-year period of marketing and exposure, and a "Disposition Value," which assumed a one-year period of marketing and exposure. *See* J.A. at 124, 272, 383-84 (altering capitalization). The 2011 appraisal of the mixed-use property offered a single "*Market Value 'As Is*'" figure of $975,000 and assumed a 12- to 18-month marketing and exposure period. *Id.* at 494, 498. Collectively, these alternative valuations ranged between $13,550,000 in "Disposition Value" for three of the four properties to $18,715,000 in "Market Value As Is" for all four properties. The appraisal reports also contained an assumption that there were no liens on the properties. *See id.* at 218, 358, 461, 500.

## 2. The Workout Agreement

The parties subsequently entered into the Workout Agreement, which stated that the obligors, including Sweely, had "requested that SunTrust Bank forbear from exercising its rights and remedies . . . to allow the Obligors time to either refinance the Loans and/or obtain equity investments in their businesses." *Id*. at 103. SunTrust made clear, however, that its agreement to forbear was conditional: "Without waiving any rights or remedies available to SunTrust Bank on account of the defaults recited above, SunTrust Bank is willing to grant the Obligors' request, provided that all of the Obligors comply with each of the terms, conditions and understandings contained in this Agreement." *Id.*

4

The principal condition was Sweely's agreement to a "disposition schedule and incentive plan" that established "turnover" dates for each of the four properties by which Sweely would either make a specific cash payment to SunTrust or voluntarily convey the collateralized property to SunTrust. *See id.* at 110-12. Each property had a different turnover date: (i) November 5, 2010, for the Florida property; (ii) January 31, 2011, for the mixed-use property; (iii) March 31, 2011, for the Winery; and (iv) June 30, 2011, for the family farm. *See id.* at 110-11. The Workout Agreement also required SunTrust to prepare and deliver the deeds to the properties to Sweely for Sweely to execute if it could not make the required payments by each property's corresponding turnover date. *See id.* at 112. If Sweely did not make the required cash payments, but instead delivered the deeds, Sweely would receive a credit from each deed toward its overall debt, culminating in its release from all future liability. *See id.* at 110-11.

For each of the properties, the disposition schedule provided that "SunTrust Bank may, immediately after such turnover date, schedule and conduct a foreclosure sale . . . which all of the Obligors agree shall be subject to the 'Friendly Foreclosure' provisions of Section 8.12 hereof." *Id.* at 110-12 (emphasis omitted). Titled "'Friendly Foreclosure' of Real Property Collateral Upon Expiration of Property-Specific Deadlines or Forbearance Default," Section 8.12 provided that the obligors would give "full cooperation with the commencement and continuation of any foreclosure action" against the collateralized properties. *Id.* at 116. The provision added:

> In the event a Foreclosure Action is commenced (but only after a Forbearance Default under this Agreement), such cooperation shall include the present agreement of each Obligor that no Obligor will contest, object to, file injunctive relief with respect to, or otherwise hinder or delay any Foreclosure Action in any way, shape or form, and will not request, induce or influence other third parties to do so.

5

*Id.* Finally, Sweely represented in the Workout Agreement that it had not granted any liens on the properties that it had not "previously disclosed" to SunTrust. *Id.* at 106.

When Sweely was unable to make the required payment by the turnover date applicable to the Florida property, it voluntarily conveyed that property to SunTrust pursuant to the Workout Agreement. As the January 31, 2011 turnover date for the mixed-use property approached, Sweely found itself unable to make the required payment. Sweely claims that it failed to convey the property by the turnover date because SunTrust refused to accept the property pursuant to a deed in lieu of foreclosure.

Sweely alleges that SunTrust contacted a title-service company to review a deed in lieu of foreclosure for the mixed-use property. The title-service company, the Amended Complaint asserts, advised SunTrust that "it would be 'much safer' for SunTrust to foreclose on the Mixed-Use Property due to the existence of liens on the property" because "[u]nder Virginia law, certain liens would have been extinguished if the property was foreclosed on but not if it was transferred by deed." *Id.* at 15. SunTrust "immediately confirmed" to the title-service company that it "would not record a deed-in-lieu and would instead foreclose on the Mixed-Use Property." *Id.* at 16. For this reason, Sweely asserts, SunTrust elected to foreclose on the mixed-use property rather than accept a deed in lieu of foreclosure.

As the March 31, 2011 turnover date for the Winery approached, Sweely again found itself unable to make the required payment. SunTrust stated that it would "forsake the Deed delivery requirement" and simply foreclose on the Winery instead. *Id.* at 19. SunTrust agreed to accept the deed in lieu of foreclosure for purposes of triggering Sweely's right to a credit and to relief from any deficiency obligations but would not record the deed. *See id.* at 19. Prior to the date of foreclosure, Revolution, LLC, a real-estate-investment firm, bought all of the Sweely

6

promissory notes from SunTrust for an aggregate price of $7.5 million.[3]  Sweely alleges that its

debt balance at this time was "just in excess of" $9 million and that the value of the remaining

collateral "was at least twice that amount."  *Id.* at 22.  Sweely later negotiated a final settlement

with Revolution, LLC that resulted in the sale of the Winery to an affiliate of Revolution, LLC in

exchange for Sweely's right to keep the family farm and avoid any deficiency judgments.

### 3.  Sweely's Lender-Liability Lawsuit

Sweely filed suit against SunTrust, three of its employees, and its outside counsel,

alleging various causes of action, including, among others, breach of contract, fraud in the

inducement, and constructive fraud.[4]  The circuit court sustained SunTrust's demurrer to the

Amended Complaint and dismissed all counts with prejudice.

The breach of contract claim failed, the court held, because the Workout Agreement

preserved SunTrust's preexisting right to foreclose and did not require SunTrust to forfeit that

right if Sweely offered a deed in lieu of foreclosure.  *See id.* at 90-91 (relying on SunTrust's

argument in its post-trial supplemental brief).  The court dismissed the fraud counts on the

ground that the Amended Complaint did not make out a prima facie case of "justifiable reliance"

on the alleged misrepresentation, *id.* at 81, because "there simply are no facts that would allow

---

[3] Sweely claims that it had been negotiating directly with Revolution, LLC prior to this time and that SunTrust tortiously interfered with Sweely's economic expectancy by announcing SunTrust's future foreclosure plans and inducing Revolution, LLC to make a deal solely with SunTrust.  In its demurrer order, the circuit court dismissed this claim with prejudice.  Because none of Sweely's assignments of error challenge this decision, we do not address it.

[4] Naming SunTrust as the sole defendant, Sweely filed a prior suit in 2014 in the Circuit Court of Madison County.  Relying on diversity jurisdiction, SunTrust removed the case to federal court pursuant to 28 U.S.C. § 1441.  Sweely thereafter obtained a voluntary dismissal of the federal case and refiled the complaint in the Circuit Court of Madison County naming SunTrust, three of its employees, and its outside counsel as defendants.

7

Sweely to reasonably rely on . . . the information that was given to [it] by the bank about the appraisals," *id.* at 79.[5]

## II.

On appeal, Sweely contends that the circuit court misread the Workout Agreement to allow SunTrust the option of foreclosing rather than accepting and recording a deed in lieu of foreclosure. Sweely also argues that the court misapplied the justifiable-reliance doctrine and, on that flawed basis, dismissed the fraud claims. We disagree with both of Sweely's assertions.

## A.

Sweely contends that the Workout Agreement forbade SunTrust from foreclosing on any of the four properties even if Sweely never paid a dollar of the underlying debt because Sweely had a right to convey the collateral to SunTrust *against SunTrust's will* by issuing a deed in lieu of foreclosure. The Workout Agreement, Sweely reasons, contemplated that SunTrust would have to immediately absorb "the continued operating costs" of the properties (relevant mostly to the Winery) and that Sweely would be protected from "the notoriety and negative business impact of public foreclosures." Appellant's Br. at 12, 16.

The circuit court read the Workout Agreement differently, as do we. The point of departure is the maxim that "[a] contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 180 n.8 (2016) (quoting 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:11, at 765 (4th ed. 2012)). "All of the

---

[5] The circuit court also held that Sweely's theory of recovery was inherently speculative as a matter of law. The court specifically "note[d] that there really are no pleaded facts that would establish any damages for [the fraud] claim[s]." J.A. at 85. Given our holding, we need not address this alternative ground for sustaining the demurrer.

8

different parts of an agreement must be viewed together, i.e., as a whole, and each part interpreted in the light of all of the other parts." *Id.* (alteration omitted) (quoting John Edward Murray, Jr., Murray on Contracts § 88(C), at 481 (4th ed. 2001)).

Prior to executing the Workout Agreement, Sweely was in default on each of the four loans and SunTrust had an uncontested right to foreclose on all of the collateralized properties. In the recitals of the Workout Agreement, SunTrust agreed to "forbear from exercising," but not to "waiv[e] any rights or remedies available to [it]," including its right to foreclose. J.A. at 103.[6] Addressing the turnover dates for the four properties, Section 5.5(a) of the Workout Agreement states that Sweely "shall deliver to SunTrust" either a specified amount of money or a "Deed" transferring the property to SunTrust. *Id.* at 110-11. If the latter, Sweely would receive an agreed-upon credit toward its overall debt, concluding with a complete release from all liability.

Not one of the four turnover provisions, however, states that SunTrust *shall accept* the deed and thereby *waive* its preexisting right to foreclose on the property. To the contrary, each provision ended with the following statement: "SunTrust Bank may, immediately after such turnover date, schedule and conduct a foreclosure sale under the [applicable mortgage or deed of trust], which all of the Obligors agree shall be subject to the 'Friendly Foreclosure' provisions of Section 8.12 hereof." *Id.* at 110-12 (emphasis omitted).

Though inartfully written, these provisions reveal a finely tuned balance of contractual rights and duties. SunTrust was free to accept and record a deed in lieu of foreclosure if it was willing to assume there were no subordinate liens against the collateralized property (thereby taking the risk there were some) that would need to be extinguished by foreclosure. SunTrust

_____

[6] "[P]refatory recitals 'shed light on the circumstances the parties wished to have considered in the interpretation of the contract.'" *Babcock & Wilcox Co.*, 292 Va. at 181 (quoting 2 E. Allan Farnsworth, Farnsworth on Contracts § 7.10, at 289 (3d ed. 2004)).

was also free to accept, without recording, a deed in lieu of foreclosure and thereafter to conduct a friendly foreclosure if the risk of subordinate liens was unacceptable. Without this choice, SunTrust would have been contractually obligated to accept and record the deed in lieu of foreclosure, afford Sweely a credit against its overall debt, and ultimately forfeit any right to pursue a deficiency judgment against Sweely — all in exchange for property potentially subject to recorded or unrecorded subordinate liens.[7] The agreement as a whole undermines this interpretation as both unreasonable and unrealistic.

In the circuit court, as here, SunTrust argued that its "right to conduct an immediate foreclosure sale after turnover of collateral, notwithstanding SunTrust's receipt of a deed, was therefore critically important to remove subordinate liens." *Id.* at 67.[8] It is hard to find fault with this interpretation. Any contractual promise that Sweely — an insolvent debtor threatening bankruptcy — might make about undisclosed liens would provide very little succor to a creditor holding millions of dollars in defaulted loans on its books. The Workout Agreement took this fact into account by preserving SunTrust's preexisting power of foreclosure, the only legal remedy that would extinguish subordinate liens and justify the forbearance compromise.

Sweely is not without a response to this view. Perhaps SunTrust intended to preserve its right to foreclose, Sweely contends, but SunTrust waived that right in Section 8.12 of the

---

[7] Sweely acknowledges the underlying premise of this observation in its Amended Complaint: "Under Virginia law, certain liens would have been extinguished if the property was foreclosed on but not if it was transferred by deed per the terms of the Workout Agreement." J.A. at 15. This concession is important because the property appraisals assumed there were no liens on the properties, *see id.* at 218, 358, 461, 500, and Sweely only promised in the Workout Agreement that it had not "granted any liens or security interests to any creditor *not previously disclosed* to SunTrust Bank in writing *on or before the date of this Agreement,*" *id.* at 106 (emphases added).

[8] In sustaining the demurrer, the trial court specifically relied on SunTrust's post-trial brief, which had raised the issue of subordinate liens. *See id.* at 90-91 (citing *id.* at 66-70).

Workout Agreement.  Words matter, and words in a contract, when clear, supersede

unarticulated intentions.  We take this point seriously, as it goes to the heart of our judicial task:

> We have neither the duty nor the inclination to creatively construe
> an unambiguous contractual phrase "so as to conform it to the
> court's notion of the contract the parties should have made" under
> the circumstances.  We are "aware of the temptation" of courts to
> "indulge in artificial interpretations or abnormal implications in
> order to save a party from a bad bargain."  We resist this
> temptation with the observation that our interpretative task is far
> simpler:  "It is the court's duty to declare what the instrument itself
> says it says."  "What the parties claim they might have said, or
> should have said, cannot alter what they actually said."

*Babcock & Wilcox Co.*, 292 Va. at 189 (alterations, footnote, and citations omitted).  We have no

disagreement with Sweely's invocation of this maxim.  We contest only its application to the

language of the Workout Agreement.

Section 8.12 is titled "'Friendly Foreclosure' of Real Property Collateral Upon Expiration

of Property-Specific Deadlines *or* Forbearance Default."  J.A. at 116 (emphasis added).  Two

paragraphs follow.  The first paragraph tracks the first half of the title — a friendly foreclosure

"Upon Expiration of Property-Specific Deadlines."  *Id.*  This paragraph obligates Sweely to

cooperate with "*any* foreclosure action . . . against *any* of the parcels of real property" subject to

the debt.  *Id.* (emphases added).  The paragraph does not state that SunTrust "shall" accept and

record a deed in lieu of foreclosure.  Nor does it expressly state or reasonably imply that Sweely,

by merely offering such a deed, can extinguish SunTrust's preexisting right of foreclosure and

thereby eliminate the legal protection that foreclosure gives SunTrust as a potentially under-

secured, priority creditor.

The second paragraph tracks the second half of the title — a friendly foreclosure

"Upon . . . Forbearance Default."  *Id.*  This paragraph adds specificity to Sweely's duty to

cooperate:  "In the event a Foreclosure Action is commenced (but only after a Forbearance

Default under this Agreement), such cooperation shall include" Sweely not "contest[ing], object[ing] to," or seeking an injunction to stop the foreclosure or attempting to hinder it in any way, and not "request[ing], induc[ing] or influenc[ing] other third parties to do so." *Id.* Read literally, this paragraph of Section 8.12 affords additional protection to SunTrust's right to foreclose in the event that Sweely fails to either make the required payment or execute a deed in lieu of foreclosure by the turnover date. The paragraph does not purport to limit SunTrust's preexisting right to foreclose but, instead, further protects it.

Sweely rejects this interpretation, contending that the parenthetical "(but only after a Forbearance Default under this Agreement)," *id.*, means nothing if it does not bar every foreclosure, whether friendly or not, unless a Forbearance Default has occurred. While we agree that "no part" of a contract "should be discarded as superfluous or meaningless," *CNX Gas Co. v. Rasnake*, 287 Va. 163, 168 (2014), we disagree that Sweely's implausible interpretation is the only one that saves the parenthetical from being wasted ink.

As noted earlier, the parenthetical is preceded by a paragraph presupposing SunTrust's right to initiate, and Sweely's duty to cooperate with, "*any* foreclosure action . . . against *any* of the parcels of real property" subject to the debt. J.A. at 116 (emphases added). The descriptive title of the entire section, moreover, tracks its two paragraphs: "'Friendly Foreclosure' of Real Property Collateral Upon Expiration of Property-Specific Deadlines *or* Forbearance Default." *Id.* (emphasis added). The parenthetical appears in the second paragraph of the section, but not in the first.

For Sweely's interpretation to be plausible, SunTrust would have had to agree to subject itself to any and all subordinate liens that it had a preexisting right to extinguish through foreclosure. And, after giving up this uncontested right, SunTrust would then have had to

12

obligate itself to give Sweely full credit toward the remaining outstanding debt and forever waive any right to seek a deficiency judgment. As the circuit court correctly concluded, this is too heavy an interpretation to drag out on such a weak textual limb.

The process of eliminating Sweely's implausible interpretation leaves only one plausible alternative: The second paragraph, including its parenthetical, provides SunTrust with additional anti-injunction specificity to Sweely's duty to cooperate following a Forbearance Default, however the parties understood that term.[9] While this thin meaning attributable to the second paragraph may seem to add little to the first, it does add *something*, and it is certainly more in line with the rest of Section 8.12 than Sweely's proffered interpretation. The process of accepting or rejecting contractual interpretations under the surplusage canon must focus on "the entire instrument" and not "detached portions," and should avoid placing too much "'emphasis on isolated terms' wrenched from the larger contractual context." *Babcock & Wilcox Co.*, 292 Va. at 180 & n.8 (citations omitted).[10]

---

[9] SunTrust argues on appeal that Sweely never did deliver an executed deed in lieu of foreclosure for the Winery. *See* Appellees' Br. at 5-6. For this reason alone, SunTrust contends, Sweely's argument collapses upon its first premise — that no Forbearance Default ever occurred and, thus, that no foreclosure of any kind could take place. Sweely disagrees, contending that "[a] Forbearance Default did not occur," Appellant's Br. at 11, because SunTrust failed to provide Sweely with the deed form prior to the turnover date for the Winery and expressly disclaimed any intent to record a deed in lieu of foreclosure conveying the Winery, *see id.* at 6-7. The circuit court did not address this issue, and our interpretation of the Workout Agreement likewise moots any need to do so.

[10] *See also Ames v. American Nat'l Bank of Portsmouth*, 163 Va. 1, 39 (1934) ("No word or clause is to be treated as meaningless if any reasonable meaning *consistent with the other parts of the contract* can be given to it . . . ." (emphasis added)); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012) ("If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.").

For these reasons, the circuit court did not err in its decision to dismiss Sweely's breach of contract claim with prejudice.

B.

The circuit court dismissed Sweely's claims for fraud in the inducement and constructive fraud on the ground that the factual allegations themselves defeated any reasonable inference of "justifiable reliance" on the alleged misrepresentation. *See* J.A. at 81-82. "[T]here simply are no facts," the circuit court held, "that would allow Sweely to reasonably rely on . . . the information that was given to [it] by the bank about the appraisals." *Id.* at 79.[11] On appeal, Sweely argues that the circuit court misapplied the justifiable-reliance doctrine. We disagree.

1.

Under Virginia law, "[f]raud, whether actual or constructive, is never presumed and must be strictly proved as alleged." *Henderson v. Henderson*, 255 Va. 122, 126 (1998). The burden of proof applicable to fraud, clear and convincing evidence, is higher than a mere preponderance. *See* Kent Sinclair, Sinclair on Virginia Remedies § 19-1[C], at 19-3 to -6 (5th ed. 2016 & Supp. 2017). In this context, the burden of *proof* is highly relevant to the burden of *pleading*. "Fraud, since it must be clearly proved, must be distinctly alleged." *Welfley v. Shenandoah Iron, Lumber, Mining & Mfg. Co.*, 83 Va. 768, 771 (1887) (citation omitted). "It will not do to state it argumentatively. The charge must be direct as the proof must be clear." *Alsop, Mosby & Co. v. Catlett & Jenkins*, 97 Va. 364, 370 (1899). For these reasons, allegations of fraud in a complaint "must show, specifically and in detail," *Southall v. Farish*, 85 Va. 403, 410 (1888), all elements

---

[11] As previously noted, *see supra* note 5, the circuit court held that Sweely's theory of recovery was inherently speculative as a matter of law because "there really are no pleaded facts that would establish any damages for [the fraud] claim[s]." J.A. at 85. We acknowledge the court's reasoning on this alternative ground but see no need to address it.

of the cause of action at a level which, if believed, would qualify as clear and convincing proof. "Generalized, nonspecific allegations . . . are insufficient to state a valid claim of fraud." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997).

One element of fraud, particularly fraud in the inducement, is that the victim "reasonably relied upon the misrepresentations . . . that allegedly constituted the fraud. Absent such reasonable or 'justifiable reliance,' no fraud is established." *Murayama 1997 Tr. v. NISC Holdings, LLC*, 284 Va. 234, 246 (2012) (citation omitted). When this subject arises during a jury trial on a motion to strike, the court asks only whether a reasonable jury could conclude that the reliance was justifiable. The court does not ask whether the evidentiary allegations themselves are true — only whether, assuming that they are true, a reasonable jury could find them sufficient to justify the plaintiff's reliance under a clear-and-convincing standard of proof.

Viewing the pleadings through this lens, a court must engage in the same analysis when considering a demurrer to a fraud claim.[12] The court must assume that the factual allegations

---

[12] The historical demurrer to the evidence is analogous to the modern motion to strike the evidence as insufficient at trial. *See* Code § 8.01-276 ("Any matter that heretofore could be reached by a demurrer to the evidence may hereafter be subject to a motion to strike the evidence."). *See generally* W. Hamilton Bryson, Bryson on Virginia Civil Procedure § 11.05[4], at 11-27 (5th ed. 2017) (describing the expansion of the motion to strike to subsume demurrers to the evidence); Martin P. Burks, Common Law and Statutory Pleading and Practice § 284, at 506-18 (T. Munford Boyd ed., 4th ed. 1952 & Supp. 1961) (also describing the acceptance of motions to strike).

Under modern practice, the expression "demurrer" is limited to a challenge to the pleadings. *See* Code § 8.01-273(A); Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 9.6, at 734 (6th ed. 2014). The conceptual framework, however, has never changed. *See Coutlakis v. CSX Transp., Inc.*, 293 Va. 212, 222 (2017) (holding that "because a rational jury could conclude the last clear chance doctrine applies based upon the *facts pled* and any reasonable inferences therefrom, the trial court erred in sustaining *the demurrer*" (emphases added)); *Horner v. Speed*, 2 Pat. & H. 616, 630-31 (1857) (opinion of Thompson, J.) (stating that the object of a demurrer to the evidence is "to declare the inference of law upon the facts proved, in like manner as it does in a demurrer in law or to the declaration upon the facts stated or averred"). *Compare Duncan v. Carson*, 127 Va. 306, 319-20 (explaining "the familiar law applicable to demurrers to the evidence"), *aff'd on reh'g*, 127 Va. 306, 326-33 (1920) (per

15

and their inferences are true and ask only whether, if such allegations and inferences are true, a reasonable jury could find the reliance justifiable based upon clear and convincing evidence.

The legal boundaries of justifiable reliance depend upon the facts of each case. Our prior cases illustrate this point. In *Murayama*, for example, a plaintiff claimed that it "had been duped" into a settlement agreement that resolved a dispute through the sale of corporate shares. *Id.* at 243. Prior to the agreement, the defendants had allegedly threatened the plaintiff with litigation if the plaintiff did not agree to sell the shares to the defendants. After the settlement agreement had been executed, the plaintiff filed suit claiming fraud in the inducement. The complaint alleged that the defendants had misrepresented the value of the shares at $2 million, while negotiating a separate sale that "would have resulted in a distribution of approximately $9,000,000 to the [plaintiff]." *Id.* The plaintiff claimed to have relied on the misrepresentation that no sale was imminent and on the omission of information regarding the sale and, as a result, to have entered into the settlement agreement that transferred the shares at a price below market value. *See id.* at 242-43.

Affirming the circuit court's sustaining of a demurrer, we stated that "to establish fraud, it is essential that the defrauded party demonstrates the right to reasonably rely upon the misrepresentation," which is an element of fraud sometimes labeled "justifiable reliance." *Id.* at 245 (emphasis and citation omitted). Without such justifiable reliance, "no fraud is established." *Id.* at 246. We then examined the plaintiff's allegations of reliance and concluded that the alleged reliance, even if factually true, was unjustified as a matter of law. Relying on prior precedent, we explained

> that parties to a settlement agreement that [are] in an adversarial

---

curiam), *with Coward*, 295 Va. at 358-59 (describing a similar standard of review for a demurrer to the pleadings).

> relationship and represented by counsel at the time of negotiation and settlement . . . *will be strictly held to this reasonable reliance standard under Virginia law* when seeking to vitiate the settlement based on claims of detrimental reliance on the misrepresentations and/or omissions of information by the adversary.

*Id.* at 248 (emphasis added) (summarizing the holding of *Metrocall of Del., Inc. v. Continental Cellular Corp.*, 246 Va. 365 (1993)).[13]

2.

The specific facts of *Murayama*, while different, share a common narrative with the present case. In *Murayama*, the alleged fraud involved the value of the corporate shares. Here, the alleged fraud involves appraisal reports valuing the collateralized property. Prior to the agreement in *Murayama*, the parties "were in an adversarial relationship and represented by counsel." *Id.* The same was true here. Sweely was in default on millions of dollars in loans. SunTrust had already seized $1.8 million from Sweely's Interest Reserve Account. Distrustful of SunTrust's alleged appraisals, Sweely asked for copies but did not receive them during negotiations. Like the plaintiffs in *Murayama*, Sweely "had every reason to be skeptical," *id.* at 249, of the alleged misrepresentation.

The parties in *Murayama* entered into the settlement agreement to avoid the imminent prospect of litigation. Similarly, Sweely threatened to delay further collection efforts by filing for bankruptcy, which would trigger an automatic stay and jeopardize SunTrust's ability to seek

---

[13] *See also* 1 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice § 14.18, at 14-40 to -41 (3d ed. 2017) (summarizing this rule from *Murayama*); Sinclair, *supra*, § 19-2[B], at 19-35 to -36 (summarizing the justifiable-reliance rule from *Metrocall*); *id.* § 55-3[C], at 55-15 to -17 (same); Sinclair & Middleditch, *supra* note 12, § 18.11, at 1443-44 (reiterating *Murayama*'s rule regarding when parties will be "strictly held to the reasonable reliance standard"). *See generally* 3 Dan B. Dobbs et al., The Law of Torts § 672, at 668-69 (2d ed. 2011 & Supp. 2018) (stating the general rule requiring justifiable reliance); William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 108, at 749-50 (Dan B. Dobbs et al. eds., 5th ed. 1984) (same).

deficiency judgments. To be sure, Sweely's theory of reliance rests in part on this premise. But for being duped into the Workout Agreement, Sweely asserts, it would have immediately stopped all of SunTrust's collection efforts by filing for bankruptcy. From any reasonable perspective, the parties negotiated and entered into the Workout Agreement, at least in part, for the purpose of avoiding the threat of imminent bankruptcy litigation.

The question that we must answer, like the one that we answered in *Murayama*, is whether a reasonable factfinder could accept Sweely's factual allegations as true and nonetheless conclude that Sweely *justifiably* relied on SunTrust's alleged misrepresentation. *See id.* at 248-49. Like the circuit court, we think not. The allegations in the Amended Complaint, when placed in the context of the relevant documents in the record and the parties' arguments, demonstrate that any alleged reliance by Sweely on the appraisal information was unjustified as a matter of law. Thus, the circuit court also did not err in its decision to dismiss the fraud in the inducement and constructive fraud claims on demurrer.[14]

### III.

In sum, the circuit court correctly interpreted the Workout Agreement to preclude Sweely's breach of contract claim and correctly held that the fraud claims failed because Sweely had not alleged any justifiable reliance on SunTrust's alleged misrepresentation. We thus affirm the judgment of the circuit court dismissing these claims with prejudice on demurrer.

*Affirmed.*

---

[14] Actual fraud claims (including claims for fraud in the inducement) must generally be distinguished from constructive fraud claims. *See* Sinclair, *supra*, § 19-2[C], at 19-38 to -40. Even so, both require a showing of "justifiable reliance by the injured party." 13 Peter Nash Swisher et al., Virginia Practice Series: Tort and Personal Injury Law § 10.5, at 321-22 (2017-2018 ed.). The parties correctly assume, therefore, that the circuit court's holding on the absence of justifiable reliance was dispositive of both of Sweely's fraud claims. *See* J.A. at 79; Appellant's Br. at 17; Appellees' Br. at 17; Reply Br. at 4-5.