COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Fulton, Causey and Lorish
Argued by videoconference


JOE ALEXANDER

v.        Record No. 0272-24-2

THE MARTIN AGENCY, ET AL.

MEMORANDUM OPINION* BY
JUDGE DORIS HENDERSON CAUSEY
SEPTEMBER 9, 2025


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Jacqueline S. McClenney, Judge

Richard F. Hawkins, III (The Hawkins Law Firm, PC, on briefs), for
appellant.

Nicole Bergstrom (Maura J. Wogan; David B. Lacy; Grayson B.
Cassada; Frankfurt Kurnit Klein & Selz, PC; Christian & Barton,
LLP, on brief), for appellees.


In October 2019, Joe Alexander sued The Martin Agency (Martin), Kristen Cavallo, and

Martin's parent company, the Interpublic Group of Companies, Inc., for defamation.  The

defamation claim was based on four articles that Martin reposted on its website about Cavallo's

success at Martin.  In discussing Cavallo's ascension, the articles referred to the sexual assault

allegations against Alexander that led to his resignation.  Defendants demurred and the circuit

court sustained the demurrer, finding that Alexander failed to state a claim.  Alexander appeals

the circuit court's decision sustaining the demurrer.

On appeal, Alexander argues that the circuit court erred in sustaining defendants'

demurrer and finding that: (i) the statements were not "of and concerning" Alexander; (ii) the

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

statements were not capable of defamatory meaning; and (iii) the statements were not false. We disagree and affirm the judgment of the circuit court.

BACKGROUND

In 2017, Joe Alexander was the Chief Creative Officer for The Martin Agency. He was accused of multiple sexual harassment allegations during his tenure at Martin. Martin informed Alexander of the claims made against him, and ultimately Alexander left the company as a result of this scandal.[1] The scandal and Alexander's subsequent resignation were widely reported in local, state, and national media. News outlets reported on the allegations, noting that some allegations went back as far as the 1990s. The widespread coverage of the scandal developed into a full-blown public relations crisis for Martin. In the aftermath of these events, Martin hired Kristen Cavallo as its new Chief Executive Officer. Cavallo's hiring was widely regarded as a resounding success, and she was lauded for playing a pivotal role in restoring public confidence and reshaping perceptions of Martin amidst the ongoing crisis. Three articles reporting on Cavallo's success following the scandal were reposted on Martin's website, which form the basis of Alexander's complaint and appeal. These articles include: (1) a January 6, 2019 article by *Refinery 29*; (2) an April 16, 2019 article by *Ad Age*; and (3) a May 9, 2019 article by *Adweek*.[2]

---

[1] The parties characterized the events as a scandal. As a factual matter, Alexander and Martin entered a "confidential settlement agreement . . . to resolve a disputed accusation." On November 21, 2017, Alexander was informed by Martin leadership that someone had filed a "sexual harassment complaint" against him and that it "looked 'bad.'" On November 30, 2017, Alexander met again with Martin's leadership and learned of multiple allegations made against him. At this point, Martin's leadership gave Alexander the option to resign before the company launched an investigation, which would lead to him being fired with cause if the allegations were proven to be true. At a meeting with Martin Human Resources on December 1, 2017, after being confronted with more complaints, Alexander submitted his resignation letter.

[2] In his opening brief, Alexander also alleged that a June 19, 2019 article by *Adweek* was posted on Martin's website. Alexander withdrew that claim in his reply brief, acknowledging that the article was not posted on Martin's website.

The first reposted article, from January 6, 2019, referred to numerous sexual harassment allegations and described the allegations as the reason Martin was let go. This article further described Alexander as having "behaved badly" and praised Cavallo for her leadership. The second reposted article, from April 16, 2019, referred to Alexander's scandal, praised Cavallo for her leadership, and quoted Cavallo as saying "don't waste a good crisis." The third reposted article, from May 9, 2019, quoted Cavallo as referring to the scandal as a "bone-crushing crisis" and praised her leadership and actions in addressing the consequences of the scandal and for rehabilitating the company's public image. Each article was merely republished on the company's website and did not originate from the company itself.

Alexander filed suit against appellees (Martin, Cavallo, and Martin's parent company, Interpublic Group of Companies, Inc. (IPG) (defendants)) alleging that the statements from these articles defamed him by implying—though not expressly stating—that the sexual harassment claims against him were true.[3] Defendants demurred to the defamation claims. The court sustained the demurrer, finding that Alexander failed to plead sufficient facts. The court reasoned that while the articles reported on the sexual harassment claims against Alexander, they could not be read to say that the sexual harassment allegations against him were substantiated. In doing so, the court reasoned that "[t]o the extent these articles even refer to Plaintiff, the [c]ourt finds that none of these references are capable of a defamatory meaning" and "any reference to the *allegations* of sexual harassment against Plaintiff are substantially accurate as acknowledged in [Alexander]'s Complaint." In other words, while the articles certainly reported

---

[3] Alexander initially brought claims against the Interpublic Group of Companies, Inc., Sissy Estes, and Tara Hanley that alleged defamation, insulting words, breach of fiduciary duty, breach of contract, gross negligence, tortious interference, common law conspiracy, intentional infliction of emotional distress, and fraud in the inducement. The litigation continued to take various shapes by adding defendants, amending complaints, and non-suits to arrive at this appeal in its current form.

on the sexual harassment claims against Alexander, the court found that Alexander could not "extrapolate beyond the 'plain and natural' meaning of the words referring to allegations of sexual harassment to claim that the . . . Defendants[] stated that [Alexander] *did* commit sexual harassment." Alexander appeals only the decision of the court as to the demurrer, alleging that the court erred in its findings that (i) the statements were not "of and concerning" Alexander; (ii) the statements were not capable of defamatory meaning; and (iii) the statements were not false.

ANALYSIS

This Court "exercise[s] de novo review of the circuit court's decision sustaining the defendants' demurrers." *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (citing *Givago Growth, LLC v. iTech AG, LLC*, 300 Va. 260, 264 (2021)). In the Commonwealth, a demurrer is a responsive pleading that allows a defendant to test "the legal sufficiency of the facts properly alleged in the challenged pleading and the inferences fairly drawn from those facts." *Murayama 1997 Trust v. NISC Holdings, LLC*, 284 Va. 234, 245 (2012). When ruling on a demurrer, a court will assess whether the facts, as alleged are true, are "legally sufficient to state a cause of action upon which relief may be granted." *Ramos v. Wells Fargo Bank, N.A.*, 289 Va. 321, 322 (2015).

Our Supreme Court has held that "the individual's right to personal security includes his uninterrupted entitlement to enjoyment of his reputation." *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006) (quoting *Jordan v. Kollman*, 269 Va. 569, 612 (2005)). Virginia recognizes the theory of defamation by implication, so long as implication is "reasonably drawn from the words actually used." *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 89 (2014). Whether such an implication may be reasonably drawn is a question of law which may be decided by demurrer. *Id.* at 90.

Although Alexander argues that the trial court erred in finding that the statements were not "of and concerning" him, we find that the court's decision to sustain the demurrer did not hinge on this factor. In its written order, the court stated that "[t]o the extent these articles even refer to Plaintiff," none of the "references are capable of a defamatory meaning." Next, the court reasoned that "any reference to the allegations of sexual harassment against Plaintiff are substantially accurate as acknowledged in Plaintiff's Complaint." As such, our analysis on appeal will focus on whether the trial court erred in finding that the references were incapable of being defamatory and whether the articles contained false statements.

I. *The circuit court did not err in finding that the articles were not "capable of a defamatory meaning."*

In sustaining the demurrer, the circuit court found that none of the statements from the reposted articles identified by Alexander were "capable of a defamatory meaning," reasoning that "any reference to the allegations of sexual harassment against [Alexander] were substantially accurate, as acknowledged in [Alexander]'s Complaint." While Alexander denies the truth of the allegations, he does not dispute that the allegations were, in fact, made. Accordingly, Alexander challenges the truthfulness of what he reads to be implications that he actually committed the alleged misconduct.

Our Supreme Court's precedent in *Webb* controls cases based on defamation by implication. In that case, Webb, a high school assistant principal, sued the Virginian-Pilot over an article that discussed the punishments of three students—including his son, Kevin—after a disagreement resulted in a physical altercation. 287 Va. at 84. The article noted that Kevin was allowed to remain in school and participate in sports, despite facing a felony charge, while another student had to transfer to a different school and subsequently dropped out. *Id.* at 87. Webb argued that the article falsely implied that he used his position to ensure preferential

treatment for Kevin.[4]  *Id.*  The circuit court overruled Virginian-Pilot's demurrer, which argued

that the article failed to create such an implication, and the case was appealed.  *Id.* at 88.

On appeal, the Supreme Court made clear that in cases of defamation by implication, the

focus is on whether "the words and statements complained of in the instant case are *reasonably*

*capable* of the meaning ascribed to them by innuendo" and that the "meaning of the alleged

defamatory language can not, by innuendo, be extended beyond its ordinary and common

acceptation."  *Id.* at 89.  "The province of the innuendo is to show how the words used are

defamatory, and how they relate to the plaintiff, but it can not introduce new matter,  nor extend

the meaning of the words used, or make that certain which is in fact uncertain."  *Id.* at 89-90.

Guided by these principles, the Court found that although the article insinuated that

Kevin received special treatment, it nonetheless did "not create a reasonable implication that

[Webb] solicited or procured the insinuated special treatment."  *Id.* at 90.  As such, in answering

"the question of whether the article is reasonably capable of the defamatory meaning," a question

of law—not fact—the Court answered in the negative.

Here, as in *Webb*, the circuit court found that none of the statements from the reposted

articles identified by Alexander were "capable of a defamatory meaning," reasoning that "any

---

[4] In that case, the article did not expressly comment on the punishment disparity, but

> paraphrased a deputy director at the Virginia High School League
> as stating that "a school principal typically determines whether a
> student is in good standing and allowed to participate in sports"
> [and] referred to state regulations permitting a school system to
> suspend or expel a student charged with a felony.  It included
> confirmation by the Chesapeake school system's spokesperson that
> a student there could be suspended or expelled if charged with a
> felony.  It further quoted the spokesperson verbatim as stating that
> "Kevin Webb 'did not get preferential treatment because of his
> dad's position.'"

287 Va. at 87.

reference to the allegations of sexual harassment against [Alexander] were substantially accurate, as acknowledged in [Alexander]'s Complaint." We agree. While the articles reference various sexual harassment allegations, they do not speak to the validity of the allegations; nor does the comparison of the environment at Martin before and after Cavallo *imply* wrongdoing on the part of Alexander.

Additionally, we disagree that other statements made in the articles that mention the sexual harassment allegations against Alexander rise to the level of defamation by implication, as such an implication cannot be "reasonably drawn from the words actually used" in the articles. *Webb*, 287 Va. at 89. Alexander's argument that the juxtaposition between his performance and Cavallo's somehow insinuates that he did, in fact, sexually harass employees "extend[s] the meaning of the words used." *Id.* at 90. In rejecting Alexander's argument, we distinguish Alexander's case from *Pendleton v. Newsome*, 290 Va. 162 (2015), where the Court held that a trial court erred in sustaining a demurrer in an implied defamation case. In *Pendleton*, a mother sued a school superintendent and other school board employees after they made various statements implying that the mother was to blame for the death of her daughter, who died from an allergic reaction to peanuts. One newsletter sent out by the school only three days after the girl's death referenced the "loss of this child" followed by it "*is a parent's responsibility to provide the school with accurate, timely information; a health emergency plan . . . and the medicine necessary to execute the plan. . . . If any one of these items is missing, the doctor's orders cannot be carried out. The school . . . relies on parents to follow through*." *Id.* at 168 (alterations in original). The Court found that unlike the plaintiff in *Webb*, the mother in *Pendleton* was the "sole and unmistakable target of any innuendo" and found that "in the context of the alleged publicity attending the case when the statements were published, it cannot be said at the demurrer stage that they were not capable of conveying the defamatory innuendo that the

plaintiff bore responsibility for her child's death." *Id.* at 173. Here, unlike this pointed reference to the mother and her deceased child as the "sole" target, the articles at issue in this case discuss changes in the culture at Martin, but not in a way that implies Alexander's leaving was the sole determinant. In contrast to the writings in *Pendleton*, the articles here primarily focus on the impact of female-led leadership and how Cavallo's perspective as a female CEO is changing the company, rather than the allegations specific to Alexander. Nor is the recounting of such allegations enough to insinuate that there was merit to the sexual assault allegations.

II. *The trial court did not err in finding that the articles did not contain false statements.*

As we have established that the court did not err in finding that the content of the articles were not "capable of a defamatory meaning," the next question to consider is whether they included false statements. "Under Virginia law, 'a private individual asserting a claim of defamation first must show that a defendant has published a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation.'" *Dangerfield v. WAVY Broadcasting, Inc.*, 228 F. Supp. 3d 696, 701 (E.D. Va. 2017) (quoting *Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 46 (2009)). A false statement contains facts that are not substantially true. *Id.* at 702. The plaintiff "must show that the defendant knew that the statement was false or, believing that the statement was true, lacked a reasonable belief for such belief, or acting negligently in failing to determine the facts on which the publication was based." *Hyland*, 277 Va. at 46.

Generally, statements that accurately describe accusations made against an individual are not considered false simply because the individual denies the underlying conduct. In *Dangerfield*, Dangerfield sued a broadcasting company for defamation after it reported that he was arrested and "accused of rape." 228 F. Supp. 3d at 700. The report stated that "[a]ccording to a warrant . . . Dangerfield raped a woman inside of her car. It happened back in May . . . ." *Id.* The court held that the report that Dangerfield was accused was "substantially accurate"

- 8 -

because Dangerfield was, in fact, named on the warrant and was suspected of committing the rape. *Id.* Therefore, the report's statements about accusation were not actionable statements of defamation, and the claims based on them were dismissed. *Id.* at 704.

*Dangerfield* makes clear the distinction between the existence of an allegation and the truth of the accusations it sets forth. Alexander denies the *truth* underlying the allegations, but he does not dispute that the allegations were made. In fact, they are consistent with his own statements. Alexander states that in 2013, he entered into a confidential settlement agreement to resolve an accusation of sexual harassment made against him. While he maintains that "the complaint of sexual harassment was a lie," he nevertheless admits that complaints were filed, and he was made aware of them. Moreover, it is undisputed that Martin was in a public relations and perception crisis because of the scandal. As was the case in *Dangerfield*, the articles accurately describe the accusations made against Alexander. The fact that Alexander disputes the underlying validity of the accusation itself does not make reporting on the existence of accusations defamatory.

Accordingly, we find that there is nothing in the record or in the identified articles that speak to the validity of the sexual harassment allegation against Alexander, only that the allegations exist.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*